# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LADMARALD CATES,

                           Petitioner,

v.

UNITED STATES OF AMERICA,

                           Respondent.

Case No. 14-CV-1092-JPS

ORDER

The petitioner, Ladmarald Cates, a former Milwaukee police officer was convicted by a jury of violating 18 U.S.C. § 242. (Case No. 11-CR-200, Docket #22).[1] Specifically, he was accused and convicted of depriving a victim of her civil rights under color of law by sexually assaulting her while he was working as a police officer. (*See* Case No. 11-CR-200, Docket #22). He has now moved to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Docket #1). The Court screened Mr. Cates' § 2255 motion, dismissing a number of claims and allowing Mr. Cates to proceed on others. (Docket #4). Mr. Cates asked the Court to reconsider its dismissal of a number of those claims (Docket #5), and the Court directed the parties to brief both the claims on which the Court allowed Mr. Cates to proceed and Mr. Cates' separate motion for reconsideration (Docket #6). The Government filed a brief addressing those matters (Docket #7) and Mr. Cates filed a response (Docket #8). The Government chose not to file a reply, so the Court views this matter as having been fully briefed and ready for decision.

---

[1] Where the Court refers to docket entries in Mr. Cates' prior criminal case, it will cite to "Case No. 11-CR-200, Docket #XX." Where the Court refers to a docket entry in the civil case opened with Mr. Cates' § 2255 motion, it will not cite to a case number, instead providing only a docket entry number.

The Court will begin its order on Mr. Cates' § 2255 motion by describing the background of this case in greater detail. It will then discuss Mr. Cates' specific claims. Finally, the Court will set forth its legal analysis.

1.    BACKGROUND

1.1    Indictment

The grand jury returned a two-count indictment against Mr. Cates on September 20, 2011. (Case No. 11-CR-200, Docket #1). Count One charged that:

> On or about July 16, 2010, at Milwaukee, in the state and Eastern District of Wisconsin, LADMARALD CATES acting under color of law as a police officer for the city [sic] of Milwaukee, wilfully subjected I.L. to the deprivation of rights secured and protected by the Constitution and laws of the United States, that is, the due process right to bodily integrity protected by the Fourteenth Amendment to the Constitution. The defendant did this by sexually assaulting I.L. This assault included aggravated sexual abuse and resulted in bodily injury. All in violation of Title 18, United States Code, Section 242.

(Case No. 11-CR-200, Docket #1 at 1). Count Two charged that:

> On or about July 16, 2010, at Milwaukee, in the state and Eastern District of Wisconsin, LADMARALD CATES used and carried a firearm during and in relation to a crime of violence that could be prosecuted in a court of the United States and possessed a firearm in furtherance of that crime of violence, which was the offense charged in Count One of this indictment. All in violation of Title 18, United States Code, Section 924(c)(1)(A).

(Case No. 11-CR-200, Docket #1 at 2).

1.2    Pretrial Process

Attorney Bridget Boyle appeared on behalf of Mr. Cates. (*See* Case No. 11-CR-200, Docket #2 (letter mailed to defendant in care of Ms. Boyle)). At

the time, she was successful in arguing for pretrial release for Mr. Cates. (Case No. 11-CR-200, Docket #4, #5).

Approximately one month later, this Court scheduled the case for a trial to begin on January 9, 2012. (Case No. 11-CR-200, Docket #11). This left slightly less than three months for the parties to prepare for trial (and slightly less than four months between the grand jury's return of the indictment and the trial date). (*See* Case No. 11-CR-200, Docket #11). Mr. Cates apparently opted to take the matter to trial, and, on December 30, 2011, the parties filed a joint final pretrial report. (Case No. 11-CR-200, Docket #16).

That same day, the Government filed a trial brief, generally describing its view of the facts and the law. (Case No. 11-CR-200, Docket #17). The Government provided that brief on its own initiative, apparently to provide the Court with a summary of its position (*see* Case No. 11-CR-200, Docket #17 at 19); no response was necessary and Mr. Cates' attorney did not file one.

Also on December 30, 2011, the Government filed a motion *in limine*, seeking to bar evidence that the victim allegedly kicked a separate officer after Mr. Cates had allegedly sexually assaulted her. (Case No. 11-CR-200, Docket #18). Mr. Cates, through Ms. Boyle, opposed the Government's motion *in limine*. (Case No. 11-CR-200, Docket #20). Prior to trial, the Court gave the parties an opportunity to further argue that issue, which both parties did. (Case No. 11-CR-200, Docket #26 at 1; Case No. 11-CR-200, Docket #64 at 3:20–6:9). Ultimately, the Court sided with Mr. Cates, denying the Government's motion *in limine* and allowing Mr. Cates to introduce evidence regarding the victim's actions (and resulting arrest and statements to police). (Case No. 11-CR-200, Docket #64:10–23).

The Court held its final pretrial conference on January 4, 2012. (Case No. 11-CR-200, Docket #19). At that conference, Ms. Boyle raised a new issue

regarding prior statements made by the victim; the Government responded that there likely would not be a dispute over that issue. (Case No. 11-CR-200, Docket #19 at 1). The Court then described its trial process. (Case No. 11-CR-200, Docket #19 at 1). After that, the Government asked a question about juror selection; presented several stipulations between the parties; and asked whether the Court would rule on its motion *in limine* (which was still pending at the time. (Case No. 11-CR-200, Docket #19 at 1). Ms. Boyle responded that she would shortly be filing a response to the motion *in limine* and raised an additional issue that may have required briefing from the parties. (Case No. 11-CR-200, Docket #19 at 1). The Court closed the final pretrial conference by requesting that Ms. Boyle discuss with Mr. Cates the fact that his taking the case to trial might expose him to a sentence enhancement for obstruction of justice and lack of ability to seek reduction for acceptance of responsibility. (Case No. 11-CR-200, Docket #19 at 1–2). Aside from receiving Mr. Cates' response to the Government's motion *in limine* (Case No. 11-CR-200, Docket #20), that final pretrial conference was the last contact that the Court had with the parties prior to the start of trial (*see* Case No. 11-CR-200, Docket #26).

### 1.3 Trial

#### 1.3.1 Jury Selection and Opening Statements

The Court conducted voir dire and excused three jurors for cause. (Case No. 11-CR-200, Docket #26 at 1–3). The parties then exercised their peremptory strikes, after which the jury was selected and sworn in. (Case No. 11-CR-200, Docket #26 at 3). At no point during peremptory strikes or thereafter did Mr. Cates' attorney object to the Government's strikes or to the selected members of the jury. (Case No. 11-CR-200, Docket #26 at 3).

The parties then provided opening statements, during which nothing of note occurred.

### 1.3.2     Government's First Witness: Victim

After opening statements, the Government called the victim as its first witness. (Case No. 11-CR-200, Docket #26 at 3–4).

#### 1.3.2.1     Victim's Direct Examination

On direct examination, the victim testified that:

(1)     on the date that Mr. Cates had allegedly assaulted her, she had called the police after an altercation with her neighbors;

(2)     Mr. Cates was on duty and responded to her call;

(3)     he had previously pulled her over twice for traffic violations and that during the first traffic stop he had given her his phone number instead of a citation;

(4)     after ensuring that no other individuals remained in the house, Mr. Cates ordered her to perform oral sex on him and to have vaginal sex with him;

(5)     she complied out of fear, because he was a police officer, was much larger than her, and had a gun;

(6)     Mr. Cates pulled her hair, grabbed her neck, and bent her over a sink to accomplish this; she did not immediately tell her boyfriend about the incident out of fear that her boyfriend would start a fight;

(7)     she was angry about the treatment of her family by Mr. Cates' partner and was arrested;

(8)     while in police custody, she told two of her friends (who were also in custody) about the incident;

(9)     Mr. Cates spoke with her while she was in custody and, out of fear, she said that she was going to say that Mr. Cates' partner raped her;

(10)     she became ill and was taken to the hospital; and

(11)    she was later interviewed by police about her allegations against Mr. Cates.

(Case No. 11-CR-200, Docket #64 at 36:19–77:21).

### 1.3.2.2   Victim's Cross Examination

Ms. Boyle then cross examined the victim. It appears that her plan on cross examination was two-fold: she attempted to both impeach the victim and also to elicit a more definite version of events, which might show that the victim's story was impossible, implausible, or inconsistent. Ms. Boyle attempted to impeach the victim by establishing that the victim:

(1)    lied in a prior proceeding while under oath;

(2)    when interviewed at the hospital, gave slightly inconsistent answers regarding

    (a)    who requested that the victim's children leave the residence,

    (b)    what occurred before the victim's boyfriend went to the store to get bottled water for Mr. Cates, and

    (c)    where and how the sexual assault occurred;

(3)    told Mr. Cates that she would blame the rape on his partner;

(4)    did not tell the first officer who interviewed her at the police station that she had been raped;

(5)    provided slightly different answers regarding the appearance of Mr. Cates' penis; and

(6)    had retained an attorney (implying that the victim planned to sue regarding the sexual assault).

Ms. Boyle also had the victim provide more details about the specifics of the event, including having the victim:

(1)    acknowledge that she was treated in an ambulance shortly after the police arrived on scene and before she returned to her house;

Page 6 of 65

(2)     acknowledge that, while Mr. Cates was in the house with her, she requested that her boyfriend leave the house to buy her a pack of cigarettes, thus leaving Mr. Cates and her alone;

(3)     provide additional details about the sexual assault and what happened thereafter (specifically, when and how she exited the house, where she went after exiting, and who she told about the assault);

(4)     describe pictures of her injuries that were taken at the hospital; and

(5)     acknowledge that she stated during her interview at the hospital that she had not told Mr. Cates to stop.

(Case No. 11-CR-200, Docket #64 at 78:4–143:8).

### 1.3.2.3   Victim's Re-Direct and Re-Cross Examinations

The Government then engaged in a short re-direct examination of the victim, asking questions about her injuries, prior lies under oath, decision to retain an attorney, and motivations in testifying against Mr. Cates. (Case No. 11-CR-200, Docket #64 at 144:13–145:20).

Ms. Boyle re-crossed the victim, further attacking her prior lies under oath and injuries. (Case No. 11-CR-200, Docket #64 at 145:22–146:18).

### 1.3.3   Government's Second Witness: Kristi Brooks

The Government next called Kristi Brooks, one of the victim's neighbors, whom the victim testified that she told about the sexual assault shortly after it occurred. (Case No. 11-CR-200, Docket #64 at 147:4–5). On direct examination, Ms. Brooks described: arriving at the scene; seeing the victim's brother and victim in a disagreement with the police; witnessing the victim leave her house and state "[h]e raped me"; and hearing the victim's story of how Mr. Cates sexually assaulted the victim. (Case No. 11-CR-200, Docket #64 at 147:4–157:24).

Ms. Boyle then cross examined Ms. Brooks, attacking Ms. Brooks' credibility and using Ms. Brooks' testimony to undermine the victim's version of events. Ms. Boyle attacked Ms. Brooks' credibility by having Ms. Brooks admit that:

(1)     she had been smoking marijuana and drinking on the day in question;

(2)     she may have been interviewed other times regarding the sexual assault but could not remember those times; and

(3)     she had not provided much information to Milwaukee police employees regarding the incident, but provided more information to an FBI agent involved in the prosecution of the case.

To undermine the victim's testimony, Ms. Boyle also got Ms. Brooks to state that she could see and smell Mr. Cates' semen on the victim's stomach, which conflicted slightly with the victim's version of events. (Case No. 11-CR-200, Docket #64 at 158:4–172:21).

On re-direct, the Government made a quick attempt to mitigate any damage done to Ms. Brooks' credibility regarding her statements to the FBI officer, but did not ask any other questions. (Case No. 11-CR-200, Docket #64 at 172:23–173:6). Ms. Boyle declined to re-cross Ms. Brooks. (Case No. 11-CR-200, Docket #64 at 173:7–8).

### 1.3.3     Government's Third Witness: Reginald Thompson

The Government next called Detective Reginald Thompson, who was a detective with the Professional Performance Division (essentially, internal affairs) of the Milwaukee Police Department at the time of the sexual assault. (Case No. 11-CR-200, Docket #64 at 173:24–174:24). Det. Thompson testified that he took the victim's statement, visited the crime scene, and interviewed Mr. Cates. (Case No. 11-CR-200, Docket #64 at 176:4–179:7). Specifically, Det.

Thompson stated that he interviewed Mr. Cates on three separate occasions; the Government played clips of those interviews, establishing—consistent with Det. Thompson's trial testimony—that Mr. Cates had altered his story throughout the course of those interviews. (Case No. 11-CR-200, Docket #64 at 179:6–191:1). Whereas Mr. Cates had originally denied any sexual contact with the victim, he later stated that he had had sexual contact with her before the date in question, and then later changed his story again to state that they had consensual sex on the date in question. (Case No. 11-CR-200, Docket #64 at 179:6–191:1). Det. Thompson also testified that he had interviewed the victim, whose story remained consistent (and that story also was consistent with the victim's trial testimony). (Case No. 11-CR-200, Docket #64 at 191:2–192:7).

Ms. Boyle then cross examined Det. Thompson. (Case No. 11-CR-200, Docket #64 at 192:16–211:6; Case No. 11-CR-200, Docket #65 at 219:24). Ms. Boyle attempted to diminish the impact of Mr. Cates' inconsistent statements in interviews by establishing that the original interview of Mr. Cates occurred on the date in question when Mr. Cates was likely very tired that day and that Mr. Cates initiated another interview, during which he changed his story, because he might have been confused, upset, and embarrassed. (Case No. 11-CR-200, Docket #64 at 192:16–197:23). Ms. Boyle also attempted to have Det. Thompson provide testimony that would undermine Kristi Brooks' testimony; this was partially successful, as Det. Thompson remembered an interview of Ms. Brooks that Ms. Brooks herself could not remember. (Case No. 11-CR-200, Docket #64 at 197:24–201:13). Ms. Boyle then questioned Det. Thompson about his interviews with the victim, pointing out minor inconsistencies between the victim's statements and trial testimony. (Case No. 11-CR-200, Docket #64 at 201:14–208:13; Case No. 11-CR-200, Docket #65

at 222:25–228:4). She also had Det. Thompson provide information about the weight of police officers' equipment, which would have made it difficult for Mr. Cates to keep his pants up, thus undermining the victim's version of events. (Case No. 11-CR-200, Docket #64 at 208:14–211:6; Case No. 11-CR-200, Docket #65 at 222:19–24). Ms. Boyle also returned to the fact that Mr. Cates had gotten back in touch with Det. Thompson to provide a further statement, which Det. Thompson admitted was a very rare occurrence. (Case No. 11-CR-200, Docket #65 at 220:6–221:1).

On re-direct examination of Det. Thompson, the Government elicited testimony to establish that Mr. Cates was treated well during his interview and that the victim's inconsistencies were limited. (Case No. 11-CR-200, Docket #65 at 228:12–231:18). Ms. Boyle decided not to re-cross Det. Thompson.

### 1.3.4   Government's Fourth Witness: Jermaine Ford

Next, the Government called Jermaine Ford, the boyfriend of the victim. (Case No. 11-CR-200, Docket #65 at 232:1–2). The main thrust of the Government's examination of Mr. Ford established that his recollection of events was consistent with that described by the victim. (Case No. 11-CR-200, Docket #65 at 235:19–241:13). Mr. Ford also testified that the victim later told him that she had been raped and that, since the incident, the victim's demeanor had changed. (Case No. 11-CR-200, Docket #65 at 241:14–243:1).

On cross examination, Ms. Boyle had Mr. Ford provide additional details about his recollection of the day in question, which, at most, were slightly inconsistent with the victim's recollections. (*See* Case No. 11-CR-200, Docket #65 at 243:8–258:4). Ms. Boyle also questioned Mr. Ford about being interviewed by police officers, pointing out minor inconsistencies in his

interviews and rehashing the ways in which his recollection slightly differed from the victim's. (Case No. 11-CR-200, Docket #65 at 258:5–271:9).

The Government declined re-direct examination.

### 1.3.5   Government's Fifth Witness: Robert Toeller

Next, the Government called Officer Robert Toeller of the Milwaukee Police Department. (Case No. 11-CR-200, Docket #65 at 271:21–272:16). Officer Toeller testified that he arrived at the scene of the incident, responding to a call for backup, and that he heard a victim scream that she had been raped. (Case No. 11-CR-200, Docket #65 at 272:24–275:11). Officer Toeller also testified that he later interviewed the victim as part of her being booked and that Mr. Cates wanted to speak with the victim, which was somewhat unusual. (Case No. 11-CR-200, Docket #65 at 275:24–279:5).

Ms. Boyle cross examined Officer Toeller, eliciting testimony that was largely consistent with what he had testified to on direct examination as well as with the victim's version of events. (Case No. 11-CR-200, Docket #65 at 279:12–289:9).

On re-direct examination: the Government asked a few clarifying questions; Ms. Boyle asked a single clarifying question on re-cross; neither re-direct nor re-cross examination produced extremely relevant testimony. (Case No. 11-CR-200, Docket #65 at 289:15–291:1).

### 1.3.6   Government's Sixth Witness: Mackenzee Kuczmarski

The Government's final witness was Mackenzee Kuczmarski, a registered nurse who had treated the victim. (Case No. 11-CR-200, Docket #65 at 292:22–293:21). Nurse Kuczmarski worked as a sexual assault nurse examiner at Aurora Sinai Hospital and examined the victim after the sexual assault. (Case No. 11-CR-200, Docket #65 at 299:3–304:18). At trial, Nurse Kuczmarski testified that she had prepared a medical record from her

examination of the victim; that record was admitted as evidence and Nurse Kuczmarski testified regarding its contents and her recollection of the examination. (Case No. 11-CR-200, Docket #65 at 304:19–237:14). Nurse Kuczmarski recalled: that the victim alleged she had been raped by a police officer; that the victim appeared shaky and upset; that Nurse Kuczmarski's interview and examination of the victim occurred outside of the presence of law enforcement officers; that the victim used the word "rape"; that the victim described pain and nausea; and that the victim described threats, including physical, verbal, and with a weapon. (Case No. 11-CR-200, Docket #65 at 304:19–327:14). Nurse Kuczmarski also read the victim's statement from the examination record, and that statement was very consistent with the victim's trial testimony. (*See* Case No. 11-CR-200, Docket #65 at 304:19–327:14).

After Nurse Kuczmarski's direct examination, the Government read into the record a stipulation between the parties:

> DNA analysis was done on clothing worn by [the victim] and Ladmarald Cates on the afternoon of July 16th, 2010. DNA material from [the victim] was found on the uniform pants and boxer shorts worn by Mr. Cates. No other DNA identifications were made.

(Case No. 11-CR-200, Docket #65 at 327:19–328:4).

Ms. Boyle then cross examined Nurse Kuczmarski: pointing out slight inconsistencies between the victim's testimony and her interview with Nurse Kuczmarski; questioning Nurse Kuczmarksi about the nature and findings of the exam; and eliciting more information about the victim's injuries, including the fact that Nurse Kuczmarski did not observe any injuries to the victim's sex organs. (Case No. 11-CR-200, Docket #65 at 328:14–367:18). Thereafter, there was a re-direct and re-cross examination of Nurse

Kuczmarksi, but neither examination was of importance. (Case No. 11-CR-200, Docket #65 at 367:22–368:12).

### 1.3.7 Government Rests, Court Addresses Exhibit 130, Mr. Cates Asserts Rule 29 Motion

After Nurse Kuczmarski's testimony, the Government rested, after which the Court excused the jury. (Case No. 11-CR-200, Docket #65 at 368:13–14).

The Court then addressed Exhibit 130, which the parties had addressed with the Court earlier at sidebar. (Case No. 11-CR-200, Docket #65 at 369:11–370:6). With the understanding that the Government would file a redacted copy, the Court received Exhibit 130. (Case No. 11-CR-200, Docket #65 at 369:11–370:6). Mr. Cates, through Ms. Boyle, agreed to this solution and the Government submitted its redacted copy prior to the return of the jury. (Case No. 11-CR-200, Docket #65 at 369:11–370:6, 371:18–23).

Finally, prior to the return of the jury, Mr. Cates orally moved for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (Case No. 11-CR-200, Docket #65 at 370:24–371:9). The Court noted the motion and took it under advisement. (Case No. 11-CR-200, Docket #65 at 371:11–12). Mr. Cates then began his presentation of evidence.

### 1.3.8 Mr. Cates' First Witness: Douglas Marx

Mr. Cates' first witness was Milwaukee Police Department Detective Douglas Marx. (Case No. 11-CR-200, Docket #65 at 372:7–22). Ms. Boyle's examination of Det. Marx was limited to establishing that, during an interview, the victim's boyfriend had told Det. Marx that: (1) the victim did not appear to be upset following the incident; and (2) the victim had vomited on the floor *before* the police arrived as opposed to after the assault, as the victim had testified at trial. (Case No. 11-CR-200, Docket #65 at 372:7–376:9).

On cross examination, the Government elicited further testimony regarding the victim's boyfriend's intellectual capacity and statements. (Case No. 11-CR-200, Docket #65 at 376:15–378:24). Mr. Cates declined re-direct. (Case No. 11-CR-200, Docket #65 at 379:1–3).

### 1.3.9    Mr. Cates' Second Witness: Alvin Hannah

Mr. Cates next called Milwaukee police officer Alvin Hannah. (Case No. 11-CR-200, Docket #65 at 379:5–21). Officer Hannah testified about the events after he and Mr. Cates had arrived on the scene, and gave detailed testimony about the events leading up to the victim's arrest. (Case No. 11-CR-200, Docket #65 at 379:5–399:16).

On cross examination, Officer Hannah clarified his recollection of events after he and Mr. Cates arrived on scene; he also testified that Mr. Cates acted somewhat strangely after exiting the victim's house: "staring straight ahead and not saying too much of anything," briefly leaving Officer Hannah alone, and seemingly lying regarding who had provided him with a set of handcuff keys. (Case No. 11-CR-200, Docket #65 at 399:19–407:10).

On re-direct, Ms. Boyle had Officer Hannah provide additional testimony about Mr. Cates' behavior. (Case No. 11-CR-200, Docket #65 at 408:11–412:7). The Government declined to re-cross Officer Hannah. (Case No. 11-CR-200, Docket #65 at 412:8–11).

### 1.3.10  Mr. Cates' Third Witness: James Fidler

Mr. Cates' next witness was Sergeant James Fidler, also of the Milwaukee Police Department. (Case No. 11-CR-200, Docket #65 at 412:13–413:5). Sgt. Fidler testified that the victim had resisted arrest, made a rape accusation at the scene, and then reiterated the rape accusation when she was in custody at the police station—although she did not tell him about

the rape when he first asked her whether she had any problems with the police officers. (Case No. 11-CR-200, Docket #65 at 412:13–422:11).

On cross examination, the Government had Sgt. Fidler clarify the events about which he testified. (Case No. 11-CR-200, Docket #65 at 422:17–424:4). Ms. Boyle declined re-direct examination. (Case No. 11-CR-200, Docket #65 at 424:5–6).

### 1.3.11  Mr. Cates' Fourth Witness: Thomas Glasnovich

Mr. Cates next called Detective Thomas Glasnovich, who investigated Mr. Cates as part of the Milwaukee Police Department's Professional Performance Division. (Case No. 11-CR-200, Docket #65 at 424:11–424:24). Det. Glasnovich testified that he could not find any ticket previously issued by Mr. Cates to the victim; this contradicted a portion of the victim's testimony. (Case No. 11-CR-200, Docket #65 at 425:8–426:24). Det. Glasnovich also testified that he interviewed the victim's boyfriend and that the victim's boyfriend did not state that the victim had seemed upset. (Case No. 11-CR-200, Docket #65 at 426:24–428:5).

The Government did not cross examine Det. Glasnovich.

### 1.3.12  Mr. Cates' Fifth Witness: Ladmarald Cates, Testifying on His Own Behalf

Mr. Cates closed his presentation of evidence by testifying on his own behalf. (Case No. 11-CR-200, Docket #65 at 428:15–469:19). Mr. Cates provided a version of events that was at odds with that of the victim. (Case No. 11-CR-200, Docket #65 at 428:15–469:19).

#### 1.3.12.1  Mr. Cates' Direct Examination

According to Mr. Cates, the entire encounter with the victim was voluntary. He testified that he asked the victim about a tattoo on her lower back, after which the victim and Mr. Cates flirted. (Case No.

11-CR-200, Docket #65 at 435:20–437:21). After that, Mr. Cates and the victim—voluntarily in Mr. Cates' telling of events—went to the back of the house and into the bathroom. (Case No. 11-CR-200, Docket #65 at 437:22–439:1).

There, according to Mr. Cates, the victim asked to see his penis and thereafter voluntarily performed oral sex on Mr. Cates for two to three minutes. (Case No. 11-CR-200, Docket #65 at 439:2–440:7). After two to three minutes, the victim stopped performing oral sex out of fear that someone would see them; Mr. Cates zipped his pants and flirted with the victim more before the victim's boyfriend returned to the house (Case No. 11-CR-200, Docket #65 at 440:8–22).

Mr. Cates stated that he then talked with the boyfriend, after which the boyfriend left the house on his own, leaving Mr. Cates and the victim alone again. (Case No. 11-CR-200, Docket #65 at 440:23–442:11). Mr. Cates and the victim walked around the house for a few minutes until the victim's boyfriend returned, this time with a beverage from the local store; Mr. Cates said he would like something to drink and the victim's boyfriend voluntarily agreed to go back to the store. (Case No. 11-CR-200, Docket #65 at 442:12–443:5).

This left Mr. Cates and the victim in the house alone, again; Mr. Cates testified that he then walked to the back "and she's back there with me, and I don't know how it occurred but she performed oral sex again." (Case No. 11-CR-200, Docket #65 at 443:6–443:11). This instance of oral sex also occurred in the bathroom area and lasted three to four minutes while the victim was holding her cell phone to her ear, on hold with a social worker regarding her brother. (Case No. 11-CR-200, Docket #65 at 443:12–444:17). According to Mr. Cates, he did not order or force the victim to perform either act of oral sex on

him. (Case No. 11-CR-200, Docket #65 at 444:18–445:1). Mr. Cates did not ejaculate; instead, the victim stopped performing oral sex because she believed she heard someone approaching. (Case No. 11-CR-200, Docket #65 at 445:2–13).

At that point, Mr. Cates and the victim left the bathroom; the victim's boyfriend had returned with Mr. Cates' beverages. (Case No. 11-CR-200, Docket #65 at 445:13–446:3). Next, Mr. Cates left the house with the victim's boyfriend. (Case No. 11-CR-200, Docket #65 at 446:5–446:21). Mr. Cates returned to the house, however, to urinate because he had drank an antioxidant tea that morning that caused him to need to urinate very badly. (Case No. 11-CR-200, Docket #65 at 446:21–447:19). He believed he was alone in the house at the time. (Case No. 11-CR-200, Docket #65 at 447:20–22).

However, shortly after Mr. Cates entered the bathroom, the victim entered and voluntarily began to perform oral sex again. (Case No. 11-CR-200, Docket #65 at 448:24–450:5). Mr. Cates then asked whether the victim wanted to have vaginal sex, to which the victim responded "um-hum." (Case No. 11-CR-200, Docket #65 at 450:6–18). Mr. Cates and the victim then had vaginal sex in the bathroom for approximately four to five minutes until Mr. Cates ejaculated in the toilet. (Case No. 11-CR-200, Docket #65 at 450:19–451:11).

Mr. Cates then cleaned up, left the house, and found that his partner was about to released the victim's brother. (Case No. 11-CR-200, Docket #65 at 451:25–452:15). Mr. Cates gave the victim's brother a bottled water and then got into his squad car. (Case No. 11-CR-200, Docket #65 at 452:17–21).

While Mr. Cates was sitting in his squad car, the victim and her neighbor, Kandice Velez, began to fight with others on scene, prompting Mr. Cates' partner to confront the victim and Ms. Velez. (Case No. 11-CR-200,

Docket #65 at 453:16–454:4). While Mr. Cates' partner began to argue with the victim and Ms. Velez, Mr. Cates left the squad car suddenly and without telling anyone to go to a nearby restaurant to use the bathroom, because he suddenly "had to use the bathroom real bad." (Case No. 11-CR-200, Docket #65 at 453:24–454:22). While walking back to the scene, Mr. Cates alerted dispatch that he was still on scene. (Case No. 11-CR-200, Docket #65 at 454:23–455:11). Upon arriving back at the scene, Mr. Cates found his partner arguing with the victim and her brother. (Case No. 11-CR-200, Docket #65 at 455:14–456:7). Mr. Cates' partner then got into an altercation with the victim's brother; the victim got involved, leading to her arrest (and the arrest of Ms. Velez and the victim's other neighbor, Kristi Brooks). (Case No. 11-CR-200, Docket #65 at 456:5–460:20). While the victim was being detained, she yelled that she had been raped. (Case No. 11-CR-200, Docket #65 at 460:21–24).

The victim was then transported to the police station, where she reasserted her rape allegations—first telling Mr. Cates that she would make the allegations against Mr. Cates' partner. (Case No. 11-CR-200, Docket #65 at 461:6–465:7). Another officer took the victim's statement, whereafter Mr. Cates was interviewed several times. (Case No. 11-CR-200, Docket #65 at 465:1–466:25).

At trial, Mr. Cates acknowledged that he told a number of lies during those interviews, but testified that he did so because he was tired and concerned about losing his job. (Case No. 11-CR-200, Docket #65 at 467:1–24). Mr. Cates also discussed the fact that he later scheduled another interview to tell the truth. (Case No. 11-CR-200, Docket #65 at 467:25–469:5).

Mr. Cates closed his direct examination by stating that he did not rape the victim. (Case No. 11-CR-200, Docket #65 at 469:8–15).

### 1.3.12.2 Mr. Cates' Cross Examination

On cross examination, the Government primarily attacked his version of events by pointing out all of the reasons that it was implausible that the victim would want to have sex: she had called the police under stressful circumstances; her windows had been broken; and her brother was being detained in the back of a squad car while she tried to reach a social worker (Case No. 11-CR-200, Docket #65 at 469:25–476:2). The Government also pointed out concerns with Mr. Cates' story: he left his partner alone at the scene to use a bathroom at a restaurant, despite the fact that there was a bathroom in the victim's house; he had changed his version of events over the course of several interviews and had been uncooperative with the investigation; and, despite professing concerns for his family, he had cheated on his wife on a number of occasions. (Case No. 11-CR-200, Docket #65 at 476:3–485:16). The Government also pointed out that Mr. Cates' version of the sex acts was confusing and that he provided extremely untruthful answers in his interviews, despite knowing that he should be truthful. (Case No. 11-CR-200, Docket #65 at 485:20–496:25).

### 1.3.12.3 Mr. Cates' Re-Direct Examination

On re-direct examination, Mr. Cates testified that he had lied during interviews to protect himself and provided additional information about the victim's activities during the incident in question. (Case No. 11-CR-200, Docket #65 at 497:1–500:12). The Government did not re-cross Mr. Cates.

### 1.3.13 Defense Rests, Court and Parties Engage in Jury Instructions Conference, Parties Offer Closing Arguments, and Court Submits Case

After Mr. Cates' testimony, he rested his case. (Case No. 11-CR-200, Docket #65 at 500:18).

The Court then held a jury instructions conference. (Case No. 11-CR-200, Docket #65 at 503:9–505:5). The Court and parties together discussed a typed, draft version of jury instructions prepared by the Court. (Case No. 11-CR-200, Docket #65 at 503:9–505:5). All agreed to remove several passages that were unnecessary, but had no other substantial changes to the instructions. (Case No. 11-CR-200, Docket #65 at 503:9–505:5).

The Court instructed the jury, after which the parties offered their closing arguments. (Case No. 11-CR-200, Docket #66 at 514:1–516:9). The Court then selected and excused an alternate juror and submitted the case to the jury for deliberation. (Case No. 11-CR-200, Docket #66 at 517:1–521:5).

### 1.3.14  Question From Jury

The Court reconvened several hours later to address a question submitted by the jury. (Case No. 11-CR-200, Docket #66 at 521:21). The jury sent a question to the Court asking, "If we answer guilty on count number 1 and we answer no to either question 1 or 2, do we invalidate the verdict?" (Case No. 11-CR-200, Docket #66 at 521:2–3). Immediately after receiving the jury's question, the Court drafted a proposed response, stating, "The court has received your note, a copy of which is attached. By way of reply, the court is unable to respond to your inquiry beyond the court's instructions on the law applicable to the case which are already before you." (Case No. 11-CR-200, Docket #24). The Government proposed that the Court respond to that question by referring to relevant page numbers in the jury instructions and providing a specific answer to the question. (Case No. 11-CR-200, Docket #66 at 522:13–523:6). Mr. Cates, through Ms. Boyle, suggested that the Court use its own proposal and that, if it was necessary to reference any pages, such reference refer to the entire substantive portion of the jury instructions (Part II, pages 10 through 24). (Case No. 11-CR-200, Docket #66 at 523:8–23).

In the end, the Court sent the jury a response comprised of the Court's proposed language, without any reference to page numbers. (Case No. 11-CR-200, Docket #24). The Court chose to do so, recognizing that it was dangerous to re-instruct the jury in any way, and so preferred its proposed language, which simply referred the jury back to the instructions before them. (Case No. 11-CR-200, Docket #66 at 523:24–525:14).

### 1.3.15 Jury Verdict and Post-Verdict Procedure

Approximately 30 minutes after the Court sent its response to the jury, the jury informed the Court that it had reached a verdict. (Case No. 11-CR-200, Docket #66 at 525:18–19). The Court and parties reconvened, at which time the verdict was read in open court. (Case No. 11-CR-200, Docket #66 at 526:21–527:11).

In sum, the jury found Mr. Cates guilty on Count One of the Indictment and not guilty on Count Two of the Indictment. (Case No. 11-CR-200, Docket #22). The jury was also instructed to answer two additional questions in the event that they found Mr. Cates guilty on Count One. First, they were required to determine whether "the actions of defendant Ladmarald Cates result[ed] in bodily injury" to the victim; the jury answered "No." (Case No. 11-CR-200, Docket #22). Second, they were required to determine whether "the actions of defendant Ladmarald Cates include[d] aggravated sexual abuse"; the jury answered "Yes." (Case No. 11-CR-200, Docket #22).

The Court asked whether the verdict, as submitted and read, was indeed the verdict of the jury; the jury answered "Yes" in unison. (Case No. 11-CR-200, Docket #66 at 527:7–10). Mr. Cates, through Ms. Boyle, declined to poll the jury. (Case No. 11-CR-200, Docket #66 at 527:15–19). With that, the

Court thanked the jurors and excused them. (Case No. 11-CR-200, Docket #66 at 527:20–529:5).

The jury having found Mr. Cates guilty, the Court directed that the probation department complete a presentence report. (Case No. 11-CR-200, Docket #66 at 529:8–530:2). The Court also set a sentencing hearing to take place on April 11, 2012. (Case No. 11-CR-200, Docket #66 at 530:3–4).

The Government then requested that Mr. Cates be detained pending the sentencing hearing. (Case No. 11-CR-200, Docket #66 at 530:7–531:17). Ms. Boyle, on behalf of Mr. Cates, objected. (Case No. 11-CR-200, Docket #66 at 531:20–533:6).

The Court declined to resolve that issue at the time, instead asking the parties for additional submissions on the issue. (Case No. 11-CR-200, Docket #66 at 533:7–14). The Court scheduled an additional hearing on the matter, and allowed Mr. Cates to remain free pending that hearing. (Case No. 11-CR-200, Docket #66 at 533:7–14).

After receiving the parties' submissions regarding Mr. Cates' post-trial release, the Court held a hearing, at which it determined that Mr. Cates must be detained pending his sentencing. (Case No. 11-CR-200, Docket #31); 18 U.S.C. §§ 3142, 3143, 3145, 3156.

### 1.3.16 Ms. Boyle's Disciplinary Proceedings and Appointment of New Attorney to Mr. Cates

Unfortunately, while the presentence report was being created and only a few days after the detention hearing, Ms. Boyle was disciplined by the Seventh Circuit. *In the Matter of: Bridget Boyle-Saxton*, 668 F.3d 471 (7th Cir. 2012). In an entirely separate case, *United States v. Rodriguez*, Case No. 11-1590, Ms. Boyle had apparently failed to respond to an order to show cause from the Seventh Circuit (the show-cause order itself resulted from Ms.

Boyle's filing of two incomplete responses and three outright failures to respond to other orders of the Seventh Circuit in the underlying case). *Boyle-Saxton*, 668 F.3d at 471. As a result of Ms. Boyle's failures, the Seventh Circuit concluded that:

> Because Boyle-Saxton has not responded to the Chief Judge's order, and thus has not asked for an evidentiary hearing, the disciplinary matter is ready for decision.
>
> She is unfit to practice law in this court. Abandonment of a client in a criminal case is reprehensible. Ignoring orders entered by a court is inexcusable. We have disbarred lawyers in similar circumstances. *See, e.g., In re Riggs*, 240 F.3d 668 (7th Cir. 2001). That is the appropriate step here too. Boyle-Saxton is disbarred. She is further ordered to refund to Rodriguez all fees she may have been paid for handling this appeal, and to provide the court within 21 days evidence that this has been done. Failure to do so will be treated as contempt of court.
>
> The court will send copies of this opinion to the Office of Lawyer Regulation of the Wisconsin Supreme Court, and to the clerks of each district court within the circuit. Boyle-Saxton must send a copy to any other jurisdiction in which she may be licensed to practice law.

*Id.* at 473. In sum, the Seventh Circuit barred Ms. Boyle from practicing in the Seventh Circuit. *Id.* Thus, Ms. Boyle's father and partner—Gerald Boyle—apparently took over handling Mr. Cates' case. (*See* Case No. 11-CR-200, Docket #32).

But Mr. Cates was not happy with this substitution. (*See* Case No. 11-CR-200, Docket #32, #36). On April 11, 2012—the date on which the sentencing was scheduled to occur—Mr. Cates informed the Court that he did not wish to proceed with either Ms. or Mr. Boyle as his attorney. (Case No. 11-CR-200, Docket #36). The Court asked both Ms. and Mr. Boyle to

formally withdraw and informed Mr. Cates that new counsel would be secured for him. (Case No. 11-CR-200, Docket #36).

As of April 23, 2012, Attorney Dennis Coffey was appointed to represent Mr. Cates. (Case No. 11-CR-200, Docket #37). Thereafter, the Court scheduled a sentencing hearing for June 29, 2012, which was later rescheduled for July 2, 2012. (Case No. 11-CR-200, Docket #38, #40).

### 1.3.17 Mr. Coffey's Motion for Extension of Time

On June 27, 2012, Mr. Coffey filed motions on Mr. Cates' behalf requesting to continue the sentencing hearing and additional time to file post-conviction motions. (Case No. 11-CR-200, Docket #42, #43). It was unclear precisely why Mr. Coffey did not make his requests sooner; he was appointed in late April of 2012, meaning that two months passed between his retention and filing of the motions. (*See* Case No. 11-CR-200, Docket #37, #41, #42, #43). In a letter accompanying the motions, Mr. Coffey stated "I am sorry that these requests are made now and not earlier but my review of materials and conversations with my client have led me to the conclusion that I need to seek this assistance from the Court." (Case No. 11-CR-200, Docket #41). In any event, the Court agreed to adjourn the sentencing date, and requested further briefing from the parties on the issue of extending the post-conviction motions deadline. (Case No. 11-CR-200, Docket #45). The Government opposed that extension. (Case No. 11-CR-200, Docket #46).

In the end, the Court held that "excusable neglect does not exist in this case," and accordingly denied the requested extension of time. (Case No. 11-CR-200, Docket #48 at 6). The Court also pointed out that Mr. Cates would "still ha[ve] the opportunity to appeal his conviction and to raise many of the matters he would otherwise raise in a post-conviction motion before this Court." (Case No. 11-CR-200, Docket #48 at 6). While—hypothetically—

certain of Ms. Boyle's errors impacted the standard to be applied on appeal, the Court also found that the standard to be applied would make little difference to the outcome and, further, that Mr. Cates had several other arguments that he could raise to avoid the issue. (Case No. 11-CR-200, Docket #48 at 6).

### 1.3.18 Sentencing

The Court finally held Mr. Cates' sentencing on July 30, 2012. (Case No. 11-CR-200, Docket #49). At the hearing, before formally imposing Mr. Cates' sentence, the Court addressed a number of outstanding issues.

First, the Court granted Mr. Cates' motion to strike several paragraphs from the presentence report. (Case No. 11-CR-200, Docket #50). Those paragraphs all related to separate allegations of sexual misconduct by Mr. Cates. (Case No. 11-CR-200, Docket #33 ¶¶ 63–67). The Government agreed with Mr. Cates' motion and asked the Court not to rely on the paragraphs in question. (Case No. 11-CR-200, Docket #68 at 3:20–4:7). Accordingly, the Court granted Mr. Cates' motion and disregarded the paragraphs. (Case No. 11-CR-200, Docket #68 at 5:7–16).

Second, the Court rejected Mr. Cates' objection to the enhancement of his offense level for obstruction of justice. (Case No. 11-CR-200, Docket #68 at 11:22–13:9). Mr. Cates argued that he should not be subject to the obstruction of justice enhancement. (Case No. 11-CR-200, Docket #68 at 9:14–17). The Court rejected that argument, noting that it had warned Mr. Cates that he might be subject to the enhancement if he chose to go to trial. (Case No. 11-CR-200, Docket #68 at 11:22–12:16). The Court also found that, in addition to lying throughout the investigation, Mr. Cates had testified untruthfully at trial, as evidenced by the jury's verdict returned against him. (Case No. 11-CR-200, Docket #68 at 12:21–13:19). The Court, thus, imposed

the obstruction of justice enhancement against Mr. Cates. (Case No. 11-CR-200, Docket #68 at 12:21–13:19).

In the final analysis, the Court was left with the following guidelines construct:

Total Offense Level: 42
Criminal History Category: I
Guideline Term of Imprisonment: 360 months to Life
Guideline Term of Supervised Release: 2 years to 5 years
Guideline Fine Range: $25,000.00 to $250,000.00
Special Assessment: $100.00

(Case No. 11-CR-200, Docket #68 at 13:23–14:7).

Next, the parties offered statements in support of their requested sentences. (Case No. 11-CR-200, Docket #68 at 14:21–26:5). Mr. Cates spoke on his own behalf, after which Mr. Coffey provided an additional statement, requesting a below-guidelines sentence of 10 to 15 years of imprisonment. (Case No. 11-CR-200, Docket #68 at 14:21–20:10). In support of that request, Mr. Coffey made several points: first, that, in a separate police brutality case, the guideline construct was approximately half of Mr. Cates' construct; second, that Mr. Cates would not be subject to such a significant sentence if prosecuted in state court for a sexual assault; third, that the sentence would not do much in the way of specific or general deterrence; and, fourth, that Mr. Cates was not in great need of rehabilitation. (Case No. 11-CR-200, Docket #68 at 16:17–20:10). The Government followed, requesting a sentence of 30 years, at the low end of the guideline range. (Case No. 11-CR-200, Docket #68 at 20:13–26:5). The Government focused primarily on: the seriousness of the offense; the effect on the victim; the effect on the community, due to the fact that Mr. Cates was a police officer; the potential to generally deter other police officers; and, Mr. Cates' "dangerous" and

"deceitful" nature. (Case No. 11-CR-200, Docket #68 at 20:13–26:5). The victim then spoke briefly, agreeing with the Government's recommendation. (Case No. 11-CR-200, Docket #68 at 27:10–24).

Finally, the Court spoke. (Case No. 11-CR-200, Docket #68 at 28:11–38:5). The Court began by noting that the guidelines overstated the seriousness of the offense, leading to a sentence that would be unduly harsh and expensive. (Case No. 11-CR-200, Docket #68 at 28:24–30:20). Next, addressing deterrence, the Court found that—especially in light of the fact that he would need to register as a sex offender and serve a term of supervised release—a within-guidelines sentence would not specifically deter Mr. Cates. (Case No. 11-CR-200, Docket #68 at 30:21–31:21, 33:15–23). Nonetheless, the Court did acknowledge the need for general deterrence to the law enforcement community. (Case No. 11-CR-200, Docket #68 at 30:21–23, 31:22–32:6, 33:3–10). The Court also acknowledged the seriousness of the offense—made all the more serious by Mr. Cates' role as a police officer. (Case No. 11-CR-200, Docket #68 at 31:22–32:2). Next, the Court discussed Mr. Cates' troubling lack of candor. (Case No. 11-CR-200, Docket #68 at 32:7–33:2).

In the end, the Court imposed a sentence of 24 years (288 months). (Case No. 11-CR-200, Docket #68 at 34:7–14, 35:12–17). The Court attributed 2 years of that sentence to Mr. Cates' obstruction of justice. (Case No. 11-CR-200, Docket #68 at 34:15–35:5). The Court also: imposed a three-year term of supervised release with a number of conditions; waived any fine; and, imposed a $100.00 special assessment. (Case No. 11-CR-200, Docket #68 at 35:18–37:9).

The Court then advised Mr. Cates of his right to appeal and directed Mr. Coffey to confer with Mr. Cates regarding the merit of an appeal. (Case No. 11-CR-200, Docket #68 at 37:10–38:3).

### 1.3.19 Direct Appeal

The Court entered its sentencing judgment against Mr. Cates on the same day as the sentencing hearing. (Docket #54). Several days later, Mr. Coffey filed a notice of appeal on Mr. Cates' behalf. (Docket #58).

On appeal, Mr. Cates, proceeding with Mr. Coffey as his attorney, challenged a single aspect of the case: the Court's denial of Mr. Cates' motion for an extension of time to file post-conviction motions. *See United States v. Cates*, 716 F.3d 445, 447 (7th Cir. 2013).

On June 13, 2013, the Seventh Circuit issued its decision, affirming the judgment against Mr. Cates. *Id.* at 451. The Seventh Circuit found that the denial of Mr. Cates' motion for an extension of time was proper. *Id.* at 450. Nonetheless, the Seventh Circuit noted that it was "particularly unhappy" with the result because Mr. Coffey did not raise any substantive challenges to Mr. Cates' conviction or sentence. *Id.* As the Seventh Circuit noted, this Court had previously acknowledged that—despite the denial of the motion for an extension—Mr. Cates "still had the opportunity to appeal his conviction and raise any issues he would have raised in his post-trial motions." *Id.* The Seventh Circuit reiterated the point, noting that any waiver issues would be viewed liberally in Mr. Cates' favor and that, if nothing else, some issues could be reviewed for plain error. *Id.* at 450–51. Nonetheless, because Mr. Cates had raised only the denial of the extension on direct appeal, and because the Seventh Circuit found no error in that regard, the Seventh Circuit affirmed the judgment against Mr. Cates. *Id.*

Mr. Cates did not file a petition for a writ of certiorari with the Supreme Court.

### 1.3.20 Mr. Cates' § 2255 Motion

On September 11, 2014, Mr. Cates filed a § 2255 motion seeking to vacate, set aside or correct his sentence. (Docket #1). The Court screened that motion, dismissing a number of claims and allowing Mr. Cates to proceed on others. (Docket #4). Mr. Cates asked the Court to reconsider its dismissal of a number of those claims (Docket #5), and the Court directed the parties to brief both the claims on which the Court allowed Mr. Cates to proceed and Mr. Cates' separate motion for reconsideration (Docket #6). The Government filed a brief addressing those items (Docket #7) and Mr. Cates filed a response (Docket #8). The Government chose not to file a reply, so the Court views this matter as having been fully briefed.

## 2. MR. CATES' CLAIMS

As the Court noted in its screening order, Mr. Cates' § 2255 motion raised nineteen separate grounds for relief. These grounds for relief fall into five categories:

(1)  ineffectiveness of trial counsel,[2] which includes the following grounds:

(a)  Ground One: denial of effective assistance of trial counsel during preliminary hearing stage (Case No. 14-CV-1092, Docket #1 at 1–5);

(b)  Ground Two: denial of effective assistance of trial counsel during pretrial stage (Case No. 14-CV-1092, Docket #1 at 5–9);

---

[2]In discussing "trial counsel," the Court is referring to Ms. Boyle-Saxton.

(c)     Ground Three: denial of effective assistance of trial counsel during trial (Case No. 14-CV-1092, Docket #1 at 10–14);

(d)     Ground Four: improper collusion between trial counsel and Government counsel (Case No. 14-CV-1092, Docket #1 at 15–16);

(e)     Ground Five: denial of effective assistance of trial counsel during detention hearing (Case No. 14-CV-1092, Docket #1 at 17–18);

(f)     Ground Six: denial of effective assistance of trial counsel during post-trial stage as a result of abandonment (Case No. 14-CV-1092, Docket #1 at 19–21);

(g)     Ground Seven: "conflict of interest" caused by Seventh Circuit disciplinary proceedings against trial counsel (Case No. 14-CV-1092, Docket #1 at 22–24);

(2)     ineffectiveness of sentencing/appellate counsel,[3] which includes the following grounds:

(a)     Ground Eight: denial of effective assistance of sentencing/appellate counsel as to post-trial period and sentencing (Case No. 14-CV-1092, Docket #1 at 25–29);

(b)     Ground Nine: denial of effective assistance of sentencing/appellate counsel on appeal (Case No. 14-CV-1092, Docket #1 at 29–31);

(3)     challenges to sentence, including the following grounds:

(a)     Ground Ten: improper sentence, pursuant to *Alleyne v. United States*, --- U.S. ----, 133 S. Ct. 2151 (2013) (Case No. 14-CV-1092, Docket #1 at 32);

(b)     Ground Eleven: improper sentence under statutory language of 18 U.S.C. § 242 (Case No. 14-CV-1092, Docket #1 at 32–34);

---

[3]In discussing "sentencing/appellate counsel," the Court is referring to Mr. Coffey.

(4) challenges to pretrial and trial procedure, including the following grounds:

    (a) Ground Twelve: improper duplicitous indictment (Case No. 14-CV-1092, Docket #1 at 34–36);

    (b) Ground Fifteen: failure to provide preliminary hearing pursuant to Rule 5.1(a) of the Federal Rules of Criminal Procedure (Case No. 14-CV-1092, Docket #1 at 43–44);

    (c) Ground Sixteen: improper exclusion of minorities from jury pool and petit jury (Case No. 14-CV-1092, Docket #1 at 44);

(5) challenges to Government's handling of evidence, including the following grounds:

    (a) Ground Thirteen: Government fabrication of evidence during investigation (Case No. 14-CV-1092, Docket #1 at 36–41);

    (b) Ground Fourteen: Government presentation of fabricated evidence to grand jury (Case No. 14-CV-1092, Docket #1 at 41–42);

    (c) Ground Seventeen: Government presentation of false testimony from witnesses (Case No. 14-CV-1092, Docket #1 at 44–50);

    (d) Ground Eighteen: Government failure to disclose exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Case No. 14-CV-1092, Docket #1 at 50–55);

    (e) Ground Nineteen: Government presentation of fabricated evidence at sentencing (Case No. 14-CV-1092, Docket #1 at 56).

The Court dismissed a substantial portion of those grounds. Specifically, the Court dismissed: Mr. Cates' challenges to his sentence (Grounds Ten and Eleven); his challenges to pretrial and trial procedure (Grounds Twelve, Fifteen, and Sixteen); and all but one of his challenges to

the Government's handling of evidence (grounds Thirteen, Fourteen, Seventeen, and Nineteen). (*See* Docket #4). Mr. Cates challenged the Court's dismissal of those grounds in a motion for reconsideration. (Docket #5).

On the other hand, the Court allowed Mr. Cates to proceed on all of his ineffective assistance claims (Grounds One through Nine) and one of his evidentiary challenges (specifically, Ground Eighteen, alleging a *Brady* violation). (*See* Docket #4).

3.    ANALYSIS

Relief under § 2255 "is reserved for extraordinary situations," *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996), "because it asks the district court essentially to reopen the criminal process to a person who has already had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). District courts may grant § 2255 relief only when an error is "jurisdictional, constitutional, or is a fundamental defect which inherently results in a complete miscarriage of justice." *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997) (quoting *Oliver v. United States*, 961 F.2d 1339, 1341 (7th Cir. 1992)).

Mr. Cates, in filing his § 2255 motion, asserts that such "jurisdictional, constitutional, or…fundamental" errors occurred in his case, thus entitling him to the extraordinary relief of § 2255. As discussed in the section above, the Court allowed Mr. Cates to proceed on a number of his assertions. The Court will start by analyzing those grounds that it allowed Mr. Cates to proceed on. Thereafter, the Court will analyze Mr. Cates' motion for reconsideration.

3.1    Grounds Before the Court on Their Merits

There are three subsets of grounds for relief before the Court on their merits. First, there are seven separate allegations that Ms. Boyle offered

ineffective assistance prior to, during, and after trial (Grounds One through Seven). Second, there are two allegations that Mr. Coffey offered ineffective assistance during sentencing proceedings and on appeal (Grounds Eight and Nine). Third, there is one allegation of a *Brady* violation (Ground Eighteen). The Court addresses these three subsets in order.

### 3.1.1 Ineffective Assistance by Ms. Boyle

To prevail in showing that Ms. Boyle provided him ineffective assistance, Mr. Cates "must satisfy the familiar two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Martin v. United States*, --- F.3d ----, No. 13-3826, slip op. at 5 (7th Cir. June 12, 2015). First, Mr. Cates "must show that counsel's representation fell below an objective standard of reasonableness, and second, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Martin*, No. 13-3826, slip op. at 5 (quoting *Strickland*, 466 U.S. at 688). This is a highly deferential standard, in particular the first prong:

> To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, our review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [*Strickland*, 466 U.S. at] 689. "The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011). So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel. *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005). *See also United States v. Lathrop*, 634 F.3d 931, 937–38 (7th Cir. 2011), *petition for cert. filed*, (U.S. June 13, 2011) (Nos. 10–11044, 10A1145) (noting that, provided counsel's reasons for not questioning further were not "so far off the wall that we can

refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient.").

*Yu Tian Li v. United States*, 648 F.3d 524, 527-28 (7th Cir. 2011)

The Court will next apply that standard to the various forms of ineffective assistance posited by Mr. Cates.

### 3.1.1.1 Failure to Move for Preliminary Hearing

Mr. Cates first argues that Ms. Boyle provided ineffective assistance by failing to move for a preliminary hearing. This ground fails as a matter of law because Mr. Cates was plainly not entitled to a preliminary hearing. Under Rule 5.1(a) of the Federal Rules of Criminal Procedure, "a magistrate judge must conduct a preliminary hearing unless…the defendant is indicted." *See also* 18 U.S.C. § 3060(e) (preliminary examination not required if "an indictment is returned"). Mr. Cates was indicted. (Case No. 11-CR-200, Docket #1). Thus, even if Ms. Boyle had requested a preliminary hearing, it would not have been necessary for Mr. Cates to receive one. Fed. R. Cr. P. 5.1(a); 18 U.S.C. § 3060(e). Therefore, Ms. Boyle's failure to request a preliminary hearing was not ineffective and did not prejudice Mr. Cates. Mr. Cates is not entitled to relief on this ground.

### 3.1.1.2 Activities During Pretrial Stage

Mr. Cates next argues that Ms. Boyle should have taken the following pretrial actions: (1) filed a motion to suppress; (2) reviewed grand jury materials to find grand jury violations; (3) challenged the indictment as duplicitous; (4) moved to dismiss the case due to the Government's use of manufactured/false evidence in a conspiracy to convict Mr. Cates; (5) kept in better contact with Mr. Cates prior to trial; (6) reviewed discovery with Mr. Cates more thoroughly prior to trial; (7) discussed trial strategy with Mr. Cates prior to trial; (8) prepared Mr. Cates better for his testimony at trial

(and/or otherwise not permitted Mr. Cates to testify at trial); (9) prepared better for trial, generally; (10) subpoenaed additional witnesses for trial; and (11) challenged the FBI reports on the case as being altered. Mr. Cates argues that Ms. Boyle's failure to take some and/or all of these actions constituted ineffective assistance that prejudiced him. The Court will assess each.

First, Ms. Boyle's failure to file a motion to suppress was not ineffective and did not prejudice Mr. Cates. Mr. Cates has not indicated—and neither the Court nor Ms. Boyle can identify (*see* Docket #7, Ex. 1, ¶ 7(a))[4]—any evidence that would have been subject to a motion to suppress. The parties stipulated to the fact that the victim's DNA material was found on Mr. Cates' pants, and the Court cannot envision any way in which that evidence could have been challenged. Mr. Cates' statements to investigators were not coerced; indeed, he even initiated one of the interrogations. The evidence and testimony regarding the physical examination of the victim was all properly admitted. In short, the Court cannot conceive of any potential suppression motion that would possibly have had any merit. Thus, Ms. Boyle's failure to posit such a motion was not ineffective and did not prejudice Mr. Cates.

Second, Ms. Boyle's alleged failure to review grand jury materials and to challenge Mr. Cates' indictment as resulting from grand jury violations

---

[4] Throughout his brief, Mr. Cates attacks the affidavits of his counsel as untruthful. His primary method of doing so is by pointing out (slight) inconsistencies between counsel's representations regarding meetings and phone calls and his own recollections thereof. Generally, the Court cites to the affidavits of counsel only to parenthetically support the Court's conclusion. Even accepting as true the non-conclusory allegations that Mr. Cates has made (and his objections to counsel's purported lies). However, even if the Court were to totally discount the credibility of the affidavits and rejected them whole-cloth, there still is not any evidence of prejudice, so the Court need not hold an evidentiary hearing or grant Mr. Cates' § 2255 motion.

requires further briefing. On this point, neither the Court nor the defendant has copies of the grand jury materials turned over to Ms. Boyle. The Court will, accordingly, grant Mr. Cates' motions for production of grand jury materials (Docket #3; Case No. 11-CR-200, Docket #85) and order, pursuant to Fed. R. Cr. P. 6(e)(3)(E)(i), the Government to produce to Mr. Cates and to the Court copies of the materials previously provided to Ms. Boyle. Because the Court is analyzing Mr. Cates' claim in this regard through the lens of Ms. Boyle's performance, the Government needs to provide only those materials to which Ms. Boyle had access. The Court reserves ruling on this issue until after Mr. Cates has had an opportunity to review those materials and further brief the matter.

Third, Ms. Boyle's failure to challenge the indictment as duplicitous was not ineffective and did not prejudice Mr. Cates. As the Court discussed at length in its screening order, the indictment was not duplicitous. (Docket #4 at 9 (citing *United States v. Hassebrock*, 663 F.3d 906, 916 (7th Cir. 2011); *United States v. Allender*, 62 F.3d 909, 912 (7th Cir. 1995); *United States v. Smith*, 26 F.3d 739, 753 (7th Cir. 1993); *United States v. Acosta*, 207 F. App'x 39, 43 (2d Cir. 2006) (simultaneously-charged 18 U.S.C. § 242 and 18 U.S.C. § 924(c) counts did not expose defendant to double jeopardy))). Therefore, any challenge to it on that basis would necessarily have failed. Failure to raise such a doomed argument was not ineffective and could not have prejudiced Mr. Cates.

Fourth, Ms. Boyle was not aware of any false or manufactured evidence; thus, she could not have raised a challenge to such evidence and was not ineffective in failing to do so. Mr. Cates does not specify what evidence against him was allegedly false or manufactured. The closest he comes is in arguing that witnesses provided inconsistent testimony. But, as

the Court discussed in its screening order, inconsistencies do not constitute fabrication; only knowing use of perjured testimony by the Government would provide a basis for relief. (Docket #4 at 11–12 (citing *Gray v. United States*, 341 F. App'x 193, 197 (7th Cir. 2009); *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005) *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990); *United States v. Serola*, 767 F.2d 364, 373 (7th Cir. 1985); *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984); *Anderson v. United States*, 403 F.2d 451, 454 (7th Cir. 1968); *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); 18 U.S.C. § 1621)). There *still* is absolutely no evidence that the Government knowingly used perjured testimony or any other fabricated evidence. There certainly was no indication of such abuse to Ms. Boyle. (Docket #7, Ex. 1 ¶ 7(d)). And, absent such indication, Ms. Boyle's failure to raise a challenge to the unidentified, allegedly-fabricated evidence was not ineffective.

Fifth and sixth, Ms. Boyle's alleged failures to keep in contact with Mr. Cates prior to trial and to review discovery with him were not ineffective and did not prejudice Mr. Cates. To begin, Ms. Boyle has listed a number of contacts that she or others from her office had with Mr. Cates prior to trial. (Docket #1, Ex. 1 ¶ 7(e)). Even taking Mr. Cates' position as true, though, and assuming that Ms. Boyle had very little personal interaction with Mr. Cates, the Court still does not see any indication that Ms. Boyle acted ineffectively. There is no magic number of times that counsel must meet with a client to provide effective counsel, but it seems to the Court that Ms. Boyle's efforts were sufficient. That is especially true in light of the fact that Ms. Boyle had been assisting Mr. Cates since before he was federally indicted. (*See* Docket #7, Ex. 1 ¶ 7(e)). Thus, it appears that Ms. Boyle had plenty of contact with Mr. Cates. In any event, it is unclear how, if at all, Ms. Boyle's alleged failures

to remain in contact and discuss discovery could have negatively impacted Mr. Cates. His position in the case was simple: to undermine the victim's and Government's version of events. In that regard, Mr. Cates appeared fully prepared for his testimony. He was a strong witness on the stand. Unfortunately for him, the Government's case was stronger, at least in the jury's eyes. Thus, the Court cannot find prejudice in this regard. Without evidence of ineffective assistance or prejudice as it relates to Ms. Boyle's pretrial contact or discussion of discovery with Mr. Cates, the Court must reject these bases for relief.

Seventh, Ms. Boyle's alleged failure to discuss her trial strategy with Mr. Cates was not ineffective and did not prejudice Mr. Cates. It is not entirely clear *what* Mr. Cates believes he should have been consulted about. (*See* Docket #8 at 10). As best the Court can tell, Mr. Cates is unhappy that he "never discussed any trial strategy, witnesses and possible impeachment of government witnesses," with Ms. Boyle. (Docket #8 at 9). But it does not appear that there is any constitutional requirement for Ms. Boyle to have discussed those matters with Mr. Cates.

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland*, 466 U.S., at 688. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S. 400, 417-418 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1 (1977) (Burger,

C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

*Florida v. Nixon*, 543 U.S. 175, 187 (2004). Thus, Ms. Boyle's failure to discuss those matters with Mr. Cates was not constitutionally ineffective. Additionally, it did not prejudice Mr. Cates. It is unclear how Mr. Cates' trial was affected at all by his lack of conversation with Ms. Boyle about their trial strategy, and he makes no argument in that regard. For these reasons, the Court is obliged to conclude that Ms. Boyle's failure to discuss trial strategy with Mr. Cates was not ineffective and did not prejudice Mr. Cates.

Eighth, Ms. Boyle's alleged failure to prepare Mr. Cates to testify was not ineffective and did not prejudice Mr. Cates. As already discussed, there is no indication that Ms. Boyle, in fact, failed to prepare Mr. Cates to testify. (*See, e.g.*, Docket #7, Ex. 1 ¶¶ 7(e), (h)). Additionally, Mr. Cates' testimony was strong; nothing indicates that he was unprepared and the Court cannot envision any way in which he could have provided better testimony. The jury simply did not believe his testimony, which was understandable in light of the evidence against him.

Ninth, Ms. Boyle's preparation for trial, in general, was not ineffective and did not prejudice Mr. Cates. The only evidence to support Mr. Cates' contention in this regard—and, indeed, most of his allegations of ineffective assistance by Ms. Boyle generally—seems to be the adverse disciplinary decisions against her. To be sure, Ms. Boyle performed well before this Court in Mr. Cates' case. There was nothing that she could or should have done better. She cross examined witnesses effectively and presented the strongest case for Mr. Cates that he could hoped to have received. As the Court has already mentioned, and will mention several more times, this case was,

essentially, a credibility contest; if the jury believed Mr. Cates' version of events, it would have acquitted him. The jury simply did not believe that version of events, but it was not through Ms. Boyle's fault. Every indication to the Court both during trial and now on § 2255 review (*see* Docket #7, Ex. 1 ¶ 7) was that Ms. Boyle was amply prepared and provided Mr. Cates with a strong defense. The Court certainly cannot find that her representation of Mr. Cates was in any way ineffective or prejudicial.

Tenth, Ms. Boyle's alleged failure to subpoena additional witnesses was not ineffective and did not prejudice Mr. Cates. It is unclear who else Ms. Boyle should have called. Mr. Cates identifies Kandice Velez, but there is no reason, whatsoever, to believe that Ms. Velez—a neighborhood friend of the victim's—would have provided any testimony helpful to Mr. Cates. Mr. Cates argues that Ms. Velez's version of events was slightly different than the victim's. (Docket #8 at 13–16). But there were such minor inconsistencies in all of the witness' testimony, and Ms. Velez's (alleged) inconsistencies were not so serious that they would have supported Mr. Cates' position alone. If anything, it is more likely that Ms. Velez would have provided testimony that largely supported the consistency of the victim's statement, thus shoring up the Government's position further. (*See* Docket #7, Ex. 1 ¶ 7(j)). The only information to the contrary is Mr. Cates' own unfounded statement, which is not sufficient to create the need for an evidentiary hearing. *See Martin*, No. 13-3826, slip op. at 5 ("a hearing is not necessary if the petition makes allegations that are 'vague, conclusory, or palpably incredible,' rather than 'detailed and specific.'") (quoting *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006)). Other than Ms. Velez, it is not clear *who* Ms. Boyle should have called. Neither Ms. Boyle (Docket #7, Ex. 1 ¶ 7(i)) nor the Government (Docket #7 at 12) knows of any additional witnesses who would have

Case 2:14-cv-01092-JPS   Filed 07/10/15   Page 40 of 65   Document 9

provided testimony positive to Mr. Cates' position. For these reasons, the Court must reject Mr. Cates' contention that the failure to call additional witnesses was in any way ineffective; and, even if it was somehow ineffective, Mr. Cates does not identify how he was prejudiced by the failure. He is not entitled to relief on this point.

Eleventh, Ms. Boyle's alleged failure to show that the FBI's reports regarding the incident were altered was not ineffective and did not prejudice Mr. Cates. Just as with Mr. Cates' allegations regarding fabricated evidence, there is absolutely no evidence before the Court to show that the FBI's reports were altered. Moreover, even if the reports *were* altered, it is not clear how that affected the outcome of the trial, and Mr. Cates provides no argument in that regard. Absent any evidence of alteration, Ms. Boyle could not have rendered ineffective assistance in failing to challenge the reports, and there is no indication that Mr. Cates was prejudiced in any way, so this ground fails.

### 3.1.1.3   Activities at Trial

Mr. Cates next argues that Ms. Boyle rendered ineffective assistance in various forms at trial: (1) in failing to challenge the racial makeup of the jury; (2) in failing to use exculpatory evidence; (3) in failing to consult Mr. Cates before entering the stipulation regarding DNA evidence; (4) in failing to present evidence to the jury regarding the Milwaukee County District Attorney's decision not to prosecute the case; (5) in failing to introduce the victim's prior criminal record to impeach her; (6) in failing to challenge the Court's response to a question from the jury; and (7) in failing to call Kandice Velez as a witness.

First, Ms. Boyle's failure to challenge the racial makeup of the jury was not ineffective and did not prejudice Mr. Cates. "The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)). "To make a prima facie showing that the fair cross-section requirement has been violated, a defendant must show that: (1) the group allegedly excluded is a distinctive group in the community, (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979); *United States v. Neighbors*, 590 F.3d 485, 491 (7th Cir. 2009); *United States v. Raszkiewicz*, 169 F.3d 459, 463 (7th Cir. 1999). Mr. Cates argues that Ms. Boyle should have objected to the makeup of the jury pool, because there were very few African-Americans in the jury pool. The Seventh Circuit has, indeed, found that African-Americans are a distinctive group in the community. *Neighbors*, 590 F.3d at 491. But Mr. Cates has not argued that they are underrepresented in this district's venires (let alone that such underrepresentation is due to systematic exclusion). And, while African-Americans do, indeed, make up a sizeable portion of the City of Milwaukee's population, their numbers in the five-county area from which this district draws its venires is substantially lower. There was at least one prospective African-American juror in this case (*see* Docket #7, Ex. 1 ¶ 8(a)), which is admittedly a low number; but the question posed by *Duren* and the related cases is whether the representation of African-Americans is underrepresented in the district's juries as a whole. The Court has no

indication that such is the case. In any event, Ms. Boyle's decision not to challenge the racial makeup of the jury was apparently strategic. (*See* Docket #7, Ex. 1 ¶ 8(a)). Ms. Boyle was aware that, given the racial makeup of the counties from which the district draws its juries, there are often low numbers of potential African-American jurors, thus making a challenge unlikely to succeed. (Docket #7, Ex. 1 ¶ 8(a)). She struck—with Mr. Cates' concurrence— the only prospective African-American juror in the case. (Docket #7, Ex. 1 ¶ 8(a)). Finally, Ms. Boyle had limited concerns about the racial makeup of the jury in light of the fact that the victim, herself, is African-American. (Docket #7, Ex. 1 ¶ 8(a)). The Court agrees that a challenge to the makeup of the venire would have been extremely unlikely to succeed, and would have made little difference to the outcome of the case. In sum, there is not nearly enough evidence to overcome the strong presumption that Ms. Boyle acted in accordance with a sound trial strategy in failing to challenge the makeup of the venire. *See Koons*, 639 F.3d at 351. Thus, the Court cannot find that she rendered ineffective assistance in this regard or that her actions prejudiced Mr. Cates.

Second, Ms. Boyle was not ineffective in allegedly failing to use exculpatory evidence. Mr. Cates does not even identify *what* exculpatory evidence was in existence, such that Ms. Boyle could be deemed ineffective for failing to use it. In fact, as should be clear from the Court's exhaustive description of trial proceedings, above, Ms. Boyle did her best to highlight inconsistencies in witness testimony and to present evidence. In the end, Mr. Cates' case was straightforward and, perhaps, not extremely strong: it essentially rested on a credibility contest between Mr. Cates and the victim. There simply was not much in the way of exculpatory evidence, aside from Mr. Cates' own version of events, which Ms. Boyle elicited through

testimony. Thus, any alleged failure to use (unspecified) exculpatory evidence was not ineffective.

Third, Ms. Boyle's stipulation regarding the DNA evidence was not ineffective and did not prejudice Mr. Cates. Mr. Cates, in his statements to law enforcement officers and in his trial testimony, admitted that he had sex with the victim. Thus, the stipulation that the victim's DNA evidence was found on his clothing was of practically no importance to the outcome of the case. Given Mr. Cates' admission to having sex with the victim, the jury would have *expected* his DNA to be present on her clothing. Ms. Boyle's stipulation to the DNA evidence was sound trial strategy: it avoided a needless witness who would ultimately prove an uncontested and non-damaging fact; indeed, calling a DNA witness could have hurt Mr. Cates if the jury felt that the Government's proving up of the DNA evidence constituted a "smoking gun."[5] Again, the Court will not take issue with Ms. Boyle's sound trial strategy. Moreover, as already noted, Mr. Cates was not prejudiced by the stipulation in light of his admissions.

Fourth, Ms. Boyle's failure to raise the Milwaukee County District Attorney's decision not to prosecute the case was not ineffective. Mr. Cates complains that Ms. Boyle should have presented evidence to the jury to show that Mr. Cates had not been prosecuted in the Wisconsin court system, because the case was not strong. (Docket #8 at 8). The Court cannot envision

---

[5]Mr. Cates is very unhappy with the DNA stipulation. (*See* Docket #8 at 11–13). The Court understands that it must seem incorrect that counsel could stipulate to something as important as DNA evidence. But what would Mr. Cates have gained by challenging the evidence. He was not proceeding with the argument that he had not had sex with the victim. Rather, he readily admitted that fact. Thus, he had absolutely nothing to gain by challenging the DNA evidence and was not harmed by its stipulated admission.

allowing this evidence to come before the jury; the federal government, of course, has independent discretion to bring charges, so the decision by a state body not to bring charges (for a different crime, the Court must add) would be of no relevance and, on the other hand, only serve to confuse the jury, making such evidence inadmissible under Rules 401, 402, and 403 of the Federal Rules of Evidence. Thus, Ms. Boyle's failure to raise that point could not possibly have been ineffective.[6]

Fifth, Ms. Boyle's failure to impeach the victim with her prior criminal record was not ineffective. Mr. Cates asserts that the victim was convicted of at least two crimes, but a search of Wisconsin public records yields (aside from traffic violations) a single criminal case, which involved only misdemeanor conduct. *See* Fond Du Lac County Case No. 2011-CM-29 (victim was charged with a Class A and a Class U misdemeanor; both were eventually dismissed; and, even if the victim had been found guilty, she would have been subject to, at most, 9 months in prison, *see* Wis. Stat. § 939.51(3), which would not have qualified her crime for admission under Fed. R. Ev. 609(a)(1)). There is no other evidence of admissible criminal conduct. Accordingly, even if Ms. Boyle had attempted to have such conduct admitted, she would have been unsuccessful. Accordingly, she was not ineffective in failing to do so and her failure did not prejudice Mr. Cates.

Sixth, Ms. Boyle was not ineffective in her response to the question sent by the jury to the Court during deliberations. On this point, Mr. Cates'

---

[6] On this point, Mr. Cates' contentions are somewhat unclear; to the extent he is arguing that Ms. Boyle should have presented evidence that caused the Milwaukee County District Attorney not to prosecute the case, he does not indicate what such evidence consists of. Thus, he is not entitled to an evidentiary hearing and the Court certainly cannot find ineffectiveness or prejudice on this point. *See Martin*, No. 13-3826, slip op. at 5 (citing *Kafo*, 467 F.3d at 1067).

position is verifiably incorrect. Ms. Boyle urged the Court to use the non-specific language it had proposed to avoid re-instructing the jury; this was contrary to the Government's position. (Case No. 11-CR-200, Docket #66 at 523:8–23). The Court sided with Ms. Boyle's position. Thus, Ms. Boyle having taken a position favorable to Mr. Cates (and there being no indication that Ms. Boyle might, somehow, have been successful in suggesting a stronger response), she certainly did not act ineffectively in this regard.

Seventh, Ms. Boyle's failure to call Kandice Velez as a witness was not ineffective and did not prejudice Mr. Cates. As already discussed, all evidence indicates that Ms. Velez's testimony would have been consistent with the victim's. (*See* Docket #7, Ex. 1 ¶¶ 7(i), (j)). Mr. Cates seems to disagree, but provides no basis for that disagreement. If anything, calling Ms. Velez may have *hurt* Mr. Cates, adding to the long list of individuals offering stories consistent with the victim's. Thus, failing to call her cannot be deemed ineffective assistance. Additionally, without any evidence that Ms. Velez's testimony would have undermined the victim's story, there is no reason to believe that Mr. Cates was in any way prejudiced by Ms. Boyle's failure to call Ms. Velez.

### 3.1.1.4 Improper Collusion Between Ms. Boyle and the Government

Mr. Cates next argues that Ms. Boyle inappropriately colluded with the Government. But there is absolutely no evidence to support this claim. Ms. Boyle admits to having occasional private conversations with the Government, but this is not atypical in criminal prosecutions and Ms. Boyle attests that nothing untoward occurred in any of her conversations. (Docket #1, Ex. 1 ¶ 9). Mr. Cates' unspecific allegations are not enough to earn him a

hearing on this point—let alone § 2255 relief. *See Martin*, No. 13-3826, slip op. at 5 (citing *Kafo*, 467 F.3d at 1067).

### 3.1.1.5 Post-Trial Detention

Mr. Cates next argues that Ms. Boyle provided ineffective assistance in defending against the Government's request to detain Mr. Cates pending trial.

But, Ms. Boyle's actions were not ineffective. In reality, there was little that Ms. Boyle could have done to prevent Mr. Cates from being detained. She wrote a strong brief in support of Mr. Cates' position and argued forcefully in support of that position at the detention hearing. But her arguments simply could not overcome the dictates of 18 U.S.C. § 3143(a). The second subsection of that statute directs that "the judicial officer *shall* order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained…." 18 U.S.C. § 3143(a)(2) (emphasis added). And, indeed, Mr. Cates had been convicted of an offense described in both 18 U.S.C. § 3142(f)(1)(A) and (B): a crime of violence, 18 U.S.C. § 3142(f)(1)(A), and an offense for which the maximum sentence is life imprisonment, 18 U.S.C. § 3142(f)(1)(B). Thus, 18 U.S.C. § 3143(a)(2) *required* the Court to detain Mr. Cates pending his sentence unless certain conditions were met: (1) that the judicial officer "finds there is a substantial likelihood that a motion for acquittal or new trial will be granted" or the Government "has recommended that no sentence of imprisonment be imposed"; and (2) the judicial officer finds that the defendant is unlikely to flee or pose a danger to the community. 18 U.S.C. § 3143(a)(2)(A–B). And, unfortunately for Mr. Cates, he did not meet those conditions. There was not a substantial likelihood that a motion for acquittal

or new trial would be granted; the Court still cannot discern a basis for such motion, nor has Mr. Cates offered one. Likewise, the Government was recommending a substantial sentence. Thus, neither of the conditions described in 18 U.S.C. § 3143(a)(2)(A) were met. Ms. Boyle argued on Mr. Cates' behalf, but it was a losing argument from the outset. Thus, she did not act ineffectively.

In any event, Mr. Cates does not say how his detention pending sentencing affected the outcome of his proceedings. Aside from the fact of being detained, Mr. Cates was not prejudiced by being held in custody. He had already been convicted and was simply awaiting sentencing and appeal. His detention or freedom had little effect on those proceedings. Thus, the Court also does not believe that Mr. Cates was prejudiced by Ms. Boyle's actions in the overall outcome of his proceedings. *See Martin*, No. 13-3826, slip op. at 5 (to prove prejudice, defendant must show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'") (quoting *Strickland*, 466 U.S. at 688).

For these reasons, the Court finds that Ms. Boyle's actions in relation to Mr. Cates' post-trial detention hearing were not ineffective and did not prejudice Mr. Cates.

### 3.1.1.6   Post-Trial Activities

Mr. Cates next challenges a number of Ms. Boyle's alleged post-trial activities: (1) failing to look into rumors that the Government had altered reports in the case; (2) failing to file a motion for a new trial; (3) failing to meet with Mr. Cates after the detention hearing; (4) failing to notify Mr. Cates that the Seventh Circuit had taken disciplinary action against her; and

(5) failing to prepare Mr. Cates for his interview with the presentence investigator.

First, Ms. Boyle's failure to look into alleged rumors that the Government had altered reports in the case was not ineffective. To begin, there is absolutely *no* evidence that the Government altered anything in this case. Any "rumors" of such alterations are "vague, conclusory, [and] palpably incredible," assertions crafted by Mr. Cates in his submissions in this case and thus there is no reason to conclude that he is entitled to a hearing on this point. *See Martin*, No. 13-3826, slip op. at 5 (quoting *Kafo*, 467 F.3d at 1067). Ms. Boyle's failure to counter unsubstantiated rumors (that do not appear to have been known to anyone but Mr. Cates) (Docket #7, Ex. 1 ¶ 11(a)), could not possibly be ineffective assistance.

Second, Ms. Boyle's failure to move for a new trial was not ineffective and did not prejudice Mr. Cates. Again, Mr. Cates' vague assertions regarding the merits of such a motion are insufficient to earn him even a hearing on this point. *See Martin*, No. 13-3826, slip op. at 5 (quoting *Kafo*, 467 F.3d at 1067). It is not clear what the basis of a motion for acquittal or a new trial would even have been. As the Court earlier noted, this case was, ultimately, a credibility contest, and thus was extremely fact-based. After having extensively reviewed the record, the Court cannot find any major evidentiary ruling that could have been challenged post-trial; there were not any infirmities with jury selection or the jury's verdict; nothing occurred during trial that was extremely prejudicial to Mr. Cates. Simply put, even with perfect 20/20 hindsight, the Court cannot see the value of a post-trial motion. Ms. Boyle apparently agreed after trial and attests that the lack of any meritorious grounds informed her decision not to request a new trial. (Docket #7, Ex. 1 ¶ 11(b)). And, without any meritorious grounds to raise in

a post-trial motion, Ms. Boyle was not ineffective in failing to submit such a motion. Likewise, because a post-trial motion would not have rested on any meritorious bases, it would not have succeeded, and thus Mr. Cates was not prejudiced by Ms. Boyle's failure to file a post-trial motion.

Third, Ms. Boyle's failure to meet with Mr. Cates after the detention hearing was not ineffective and did not prejudice Mr. Cates. Ms. Boyle has attested that she did not believe it necessary to meet with Mr. Cates between the verdict and the completion of the presentence report, and so did not do so. (Docket #7, Ex. 1 ¶ 11(c)). The Court does not believe that decision was so far outside of the norms of the profession as to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Nixon*, 543 U.S. at 187 (citing *Strickland*, 466 U.S. at 689). That is all the more true, here, because Ms. Boyle's father and law partner did, in fact, visit Mr. Cates in jail to begin preparing for sentencing; this was made necessary by Ms. Boyle's two hospitalizations. (Docket #7, Ex. 1 ¶ 11(c)). Thus, while Ms. Boyle may not have visited Mr. Cates, she *did* make efforts to compensate for her difficulties meeting with Mr. Cates. In any event, Ms. Boyle's failure to meet with Mr. Cates did not prejudice him in any way. Mr. Cates does not identify anything in the presentence process that negatively impacted his sentence, nor can the Court identify anything.

Fourth, Ms. Boyle's failure to notify Mr. Cates of the disciplinary action taken against her was not ineffective and did not prejudice Mr. Cates. The Seventh Circuit's disciplinary order did not clearly specify its effect on Ms. Boyle's ability to practice in front of this Court. In relevant part, the order stated: "She in unfit to practice law in this court…Boyle-Saxton is disbarred…The court will send copies of this opinion to the Office of Lawyer Regulation of the Wisconsin Supreme Court, and to the clerks of each district

court within the circuit." *Boyle-Saxton*, 668 F.3d at 473. That order clearly prohibits Ms. Boyle from practicing in front of the Seventh Circuit, but is unclear as to how it impacted her ability to practice before the Circuit's district courts. In fact, because the Seventh Circuit sent a copy of its order to the district courts of the circuit—just as it did to Wisconsin's disciplinary body—the Court assumed that the decision over whether to prohibit Ms. Boyle from practicing would lie with each district court separately. In other words, it seems as though Ms. Boyle was allowed to practice before this Court, and so did nothing wrong in not telling Mr. Cates about the disciplinary issues. In any event, even if that was an error, it did not negatively impact Mr. Cates. Ms. Boyle sent her father to work with Mr. Cates, and Mr. Cates ended up getting replacement counsel, anyway. If Ms. Boyle had attempted to represent Mr. Cates before the Seventh Circuit, that would have been problematic, but that did not occur. Without more, the Court simply cannot see how Ms. Boyle's disciplinary issues in another case impacted Mr. Cates in any way. Thus, those issues did not constitute ineffective assistance nor did they prejudice Mr. Cates.

Fifth, Ms. Boyle's alleged failure to prepare Mr. Cates for his interview with the presentence investigator was not ineffective and did not prejudice Mr. Cates. As Ms. Boyle points out in her affidavit, there was little that Mr. Cates needed to prepare for: he planned to provide only information regarding his personal background. (Docket #7, Ex. 1 ¶ 11(e)). He later had ample opportunity with replacement counsel to review and object to the presentence report, as it was submitted to the Court. (Case No. 11-CR-200, Docket #68 at 5:7–8:23). He did so, and the Court even sustained a number of his objections. (*See* Case No. 11-CR-200, Docket #68 at 5:7–8:23). Other than the information that the Court disregarded, there was very little in the

presentence report that negatively impacted Mr. Cates. Thus, it is unclear how any additional preparation would have helped Mr. Cates; or, stated in the negative, it is not clear how Ms. Boyle's alleged failure to prepare Mr. Cates negatively impacted him or his sentence. For these reasons, the Court finds that Ms. Boyle's alleged failure in that regard was not ineffective and did not prejudice Mr. Cates.

### 3.1.1.7  Conflict of Interest

Mr. Cates' final allegation relating to Ms. Boyle is that the Seventh Circuit's action against her somehow created a conflict of interest. It is entirely unclear what Mr. Cates means by that and how he believes that it impacted him in any way. As with practically everything in Mr. Cates' § 2255 submissions, he does nothing more than provide vague and conclusory allegations that are insufficient to warrant an evidentiary hearing. *See Martin*, No. 13-3826, slip op. at 5 (quoting *Kafo*, 467 F.3d at 1067).

To the extent that Mr. Cates is alleging that Ms. Boyle's disciplinary troubles *de facto* establish that she was ineffective, he is incorrect. The Court gets the sense from Mr. Cates' petition that he believes that he is entitled to relief because the Seventh Circuit took issue with Ms. Boyle's representation in another case. To be sure, her behavior in that other case was concerning. But it was still behavior *in another case*. In reality, Mr. Cates does not identify any significantly concerning behavior on the part of Ms. Boyle. Likewise, the Court cannot find any. In fact, the Court felt that Ms. Boyle did as good of a job as possible in the circumstances. She had a tough case to present: it was a credibility contest and she was representing Mr. Cates who had provided multiple inconsistent statements, whereas the victim had offered consistent statements. And, while she may have abandoned her client before the

Seventh Circuit, there is no indication that she did the same to Mr. Cates.

### 3.1.2 Ineffective Assistance by Mr. Coffey

Mr. Cates argues that Mr. Coffey provided ineffective assistance to him at both the sentencing and appellate phases of the proceedings.

#### 3.1.2.1 Sentencing Phase

Mr. Cates argues that Mr. Coffey provided him with ineffective assistance of counsel in multiple ways during the phase leading up to sentencing: (1) by failing to make a record regarding Ms. Boyle's allegedly deficient performance; (2) by failing to document allegedly false trial testimony; (3) by failing to contest various factual matters in the presentence report; and (4) by disregarding Mr. Cates' argument that he should not have been found to have engaged in aggravated sexual abuse.

First, Mr. Coffey's failure to make a record regarding Ms. Boyle's allegedly deficient performance did not prejudice Mr. Cates. The Court will assume, *arguendo,* that Mr. Coffey should have made a record regarding Ms. Boyle's allegedly-deficient performance. But, even if he had made that record, Mr. Cates *still* would not have been entitled to relief. As the Court extensively discussed in the prior section, there is no indication that Ms. Boyle did anything in Mr. Cates' case that approached ineffective assistance. Thus, even if Mr. Coffey had timely moved for a new trial on the basis of Ms. Boyle's alleged deficient performance, the Court would have denied that motion. As such, Mr. Cates suffered no prejudice from Mr. Coffey's performance.

Second, Mr. Coffey's failure to document allegedly false trial testimony was not ineffective and did not prejudice Mr. Cates. The allegedly false testimony, as the Court has already discussed and as Mr. Coffey recognized (Docket #7, Ex. 2 ¶ 7(b)), was made up of nothing more than

inconsistencies (which the jury chose to disregard). There was no need to make a record of those inconsistencies because they could not possibly have entitled Mr. Cates to relief. There was more than sufficient evidence to convict Mr. Cates, and so those inconsistencies were of little value to Mr. Cates. For these reasons, this action was not ineffective and did not prejudice Mr. Cates.

Third, Mr. Coffey's work on the presentence report was not ineffective and did not prejudice Mr. Cates. In fact, Mr. Coffey challenged various portions of the presentence report, and the Court sustained his challenges. (Case No. 11-CR-200, Docket #68 at 5:7–8:23). Thus, the Court cannot see any way in which Mr. Coffey acted ineffectively; in fact, he acted *effectively* on Mr. Cates' behalf. Mr. Cates also does not identify any prejudice on this topic.

Fourth—and this is what Mr. Cates really seems to be challenging regarding Mr. Coffey's work on his presentence report—Mr. Coffey's failure to object to the offense conduct described in the presentence report was not ineffective and did not prejudice Mr. Cates. To be clear, Mr. Cates had been found guilty beyond a reasonable doubt of the conduct described in the presentence report. To be sure, he disagreed with that version of events—that was his theory of the case, and the Court heard that theory. But, after the jury effectively resolved that factual dispute, there was no basis remaining for Mr. Cates to object to the description of the offense conduct. That description, effectively, became the factual version of events after the jury rendered its verdict. And the Court would have rejected any objection to that description as baseless. Thus, the Court agrees with the Government and Mr. Coffey that there was no basis to interpose an objection on that ground (*see* Docket #7, Ex. 1 ¶ 7(d)); Mr. Coffey did not act ineffectively in doing so, nor would such an objection possibly have been successful.

Finally, the Court notes that Mr. Cates is likely unhappy that Mr. Coffey failed to timely file a motion for a new trial or acquittal. But, as the Court has already recounted, there is no indication that any such motion would have been successful. The Court cannot find any ground for such a motion that would have been successful Accordingly, Mr. Coffey's failure to timely move for a new trial or acquittal—even if it was ineffective—did not prejudice Mr. Cates.

### 3.1.2.2    Appeals Phase

"The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). With that said, "[a]ppellate counsel is not required to present every non-frivolous claim on behalf of her client." *Makiel*, 782 F.3d at 897 (citing *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996)). Rather, "[a]ppellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised." *Makiel*, 782 F.3d at 898 (citing *Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010); *Lee v. Davis*, 328 F.3d 896, 900–01 (7th Cir. 2003)). This is a difficult showing to make, "because the comparative strength of two claims is usually debatable." *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013).

Mr. Cates alleges that he asked Mr. Coffey to raise a number of arguments on appeal to no avail. Specifically, Mr. Cates states that he wanted to challenge the following issues on appeal: (1) jury instructions; (2) false information in the presentence report; (3) false statements to the Court and jury; and (4) deficient performance by Ms. Boyle.

At the outset, the Court notes that the Seventh Circuit expressly criticized Mr. Coffey's approach on appeal. It stated:

> we note that we are particularly unhappy with the result in this case because Cates does not challenge any aspect of his conviction or sentence on appeal—despite this being his direct appeal from his conviction—and instead argues only that the district court should have allowed him to file late post-conviction motions. In denying Cates' motion, the district court noted that Cates still had the opportunity to appeal his conviction and raise any issues he would have raised in his post-trial motions. But Cates has declined to do so, stating only that "those appellate issues not preserved by appropriate trial counsel action are not available to the Defendant on this appeal."
>
> As we indicated at oral argument, we are puzzled by this position. Of course, the doctrines of waiver and forfeiture would come into play for any issues not properly preserved below, but as "[w]aiver principles must be construed liberally in favor of the defendant," *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010) (citation omitted), and we "assume forfeiture where the government fails to proffer a strategic justification for a defendant's decision to bypass an argument," *United States v. Johnson*, 668 F.3d 540, 542 (7th Cir. 2012) (citation omitted), we imagine that at least some issues would be reviewed for plain error. *See, e.g., United States v. Rea*, 621 F.3d 595, 602 (7th Cir.2010) (sufficiency of the evidence challenge reviewed for plain error when defendant fails to raise the issue in a Rule 29 motion for judgment of acquittal at the district court). And plain error review, while a demanding standard, is better than no review at all. *See, e.g., United States v. Meadows*, 91 F.3d 851, 855–56 (7th Cir. 1996) (reversing conviction for insufficient evidence under plain error standard). Nevertheless, Cates has failed to raise any potential challenges to his conviction or sentence, and they are therefore waived on appeal and left for post-conviction proceedings.

*Cates*, 716 F.3d at 450. And, to be sure, Mr. Coffey's decision was somewhat perplexing. But, of course, the question before the Court is whether that decision violated the *Strickland* standard.

In the Court's opinion, Mr. Coffey raised the strongest ground on appeal, and thus his performance on appeal cannot be deemed ineffective. *See Makiel*, 782 F.3d at 897. Any ground that Mr. Cates could have raised on appeal—be it one of the four grounds asserted by Mr. Cates as potential bases for appeal (jury instructions, false information in presentence report, false statements to the Court, and deficient performance); the ground of sufficiency of the evidence, which the Seventh Circuit raised in passing, *see Cates*, 716 F.3d at 450; or, perhaps, an unspecified sentencing issue—would all have been extremely weak claims on appeal. First, the Court cannot identify any issues with its jury instructions; in any event, because Mr. Cates did not object to the jury instructions, he could have prevailed on appeal only by showing clear error, which would not have been possible in light of the fact that the jury instructions were correct. Second, the Court excised and corrected any issues with the presentence report (aside from the description of the crime, which the Court has already discussed at length), so Mr. Cates would have no basis to challenge that information on appeal. Third, the false statements that Mr. Cates addresses were all mere inconsistencies, which (again, as the Court has already discussed at length) would not have entitled him to any relief. Fourth, again as the Court has already noted, Ms. Boyle's performance was not deficient, meaning that Mr. Cates would not have prevailed on that issue before the Seventh Circuit. Fifth, the evidence against Mr. Cates was strong; a sufficiency-of-the-evidence challenge would have been exceedingly unlikely to prevail. The Seventh Circuit will not set aside a jury verdict unless there is no evidence in the record, regardless of how it

is weighed, from which a jury could have returned a verdict of guilty. *United States v. Pesbitero*, 569 F.3d 691, 704 (7th Cir. 2009). Here, where the victim testified consistently with various prior statements and was supported in her version of events by multiple other witnesses, the Seventh Circuit would have been exceedingly unlikely to reverse Mr. Cates' conviction. Finally, the Court cannot identify any sentencing issue that would have come close to warranting reversal. The Court: considered all of the 18 U.S.C. ¶ 3553(a) factors (Case No. 11-CR-200, Docket #68 at 28:11–38:5); gave Mr. Cates a significant break in refusing to consider his prior conduct (Case No. 11-CR-200, Docket #68 at 5:7–16); amply explained its (correct) reasoning behind rejecting Mr. Cates' objection to the enhancement of his offense level for obstruction of justice (Case No. 11-CR-200, Docket #68 at 11:22–13:9); and sentenced Mr. Cates to a below-guidelines sentence (Case No. 11-CR-200, Docket #68 at 34:7–14, 35:12–17). It is hard to see any strong basis for appealing Mr. Cates' sentence.

Compare those weak bases for relief with the ground that Mr. Coffey *did* raise; that single issue spurred the Seventh Circuit to issue a lengthy and extensively-cited opinion. It was certainly a close call, one much more likely to prevail than any of the grounds discussed above.

As the Seventh Circuit recently discussed,

> "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986), *quoting Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). In fact, when appellate judges address professional education programs on appellate practice, they almost always stress this need for careful selection of just a few issues on appeal. "Lawyers must curtail the number of issues they present, not only because briefs are limited in length but also because the more issues a

brief presents the less attention each receives, and thin presentation may submerge or forfeit a point." *Knox v. United States*, 400 F.3d 519, 521 (7th Cir. 2005).

*Makiel*, 782 F.3d at 897-98. Mr. Coffey certainly believed that he was taking the right approach in limiting the number of claims to the one he believed most meritorious (and that, in his opinion, would provide a safer and more effective path to raising other issues, such as deficient performance). (Docket #7, Ex. 2 ¶¶ 9(a–b). The Court finds that this strategy not only satisfies the constitutional mandates of Mr. Coffey's role as appellate counsel, but that, in fact, Mr. Coffey's approach was well-reasoned.

For these reasons, the Court rejects Mr. Cates' attack on Mr. Coffey's actions on direct appeal.

### 3.1.3    *Brady* Violation

Mr. Cates alleges that he was deprived of certain pieces of exculpatory evidence, in violation of *Brady*, 373 U.S. 83. This claim fails for various reasons.

First, Ms. Boyle has attested that she received all possible exculpatory evidence in the case and that she is not aware of any evidence that she did not receive. (Docket #7, Ex. 1 ¶ 13).

Second, as the Government rightly points out, if Mr. Cates is challenging anything *Brady*-related, he actually appears to be challenging the manner in which Ms. Boyle presented the exculpatory evidence. (Docket #7 at 28). That is, he believes that Ms. Boyle did not do a good enough job attacking witnesses with allegedly exculpatory evidence. There is no *Brady* violation in that situation. *United States v. Mota*, 685 F.3d 644, 648–49 (7th Cir. 2012).

Third, to the extent that Mr. Cates is, in fact, arguing that any evidence was withheld, he fails to identify what it was (or even what it *might* be). (*See* Docket #8 at 5 (noting that Government must turn over exculpatory evidence, but not giving any indication of what was withheld, who withheld it, etc.)). Again, Mr. Cates' assertions in this regard amount to vague generalities that do not even rise to the level of entitling him to an evidentiary hearing. *See Martin*, No. 13-3826, slip op. at 5 (quoting *Kafo*, 467 F.3d at 1067).

For these reasons, the Court is obliged to reject Mr. Cates' *Brady* argument.

### 3.2     Grounds Before the Court on Motion for Reconsideration

The Court has rejected all of Mr. Cates' arguments that were before it directly on their merits. That leaves only the claims that the Court previously dismissed and that are now subject to Mr. Cates' motion for reconsideration.

Of course, there is a higher standard applied on motions for reconsideration. *See United States v. Gargano*, 826 F.2d 610, 611 (7th Cir. 1987) (noting that Fed. R. Civ. P. 59(e) standard applies to motions for reconsideration in the context of § 2255 motions). And that does not mention the fact that there may be problems with successiveness under § 2255(h) when a § 2255 movant requests reconsideration. *See Banks v. United States*, 167 F.3d 1082, 1083–84 (7th Cir. 1999). But, even discarding those higher standards and the successiveness concerns, Mr. Cates still is not entitled to relief on any of the previously-dismissed grounds; the Court re-affirms its dismissal of each one of those grounds, not only because Mr. Cates procedurally defaulted each of the grounds (which he did), but also because the grounds lack merit.

### 3.2.1    Improper Sentence Pursuant to *Alleyne*

The Court dismissed Mr. Cates' tenth ground, which argued that his sentence was improper in light of *Alleyne v. United States*, --- U.S. ----, 133 S.Ct. 2151 (2013). That dismissal was correct, as evidenced by the Seventh Circuit's recent decision in *Crayton v. United States*, No. 13-3548, slip op. (7th Cir. June 25, 2015), which held that *Alleyne* does not apply retroactively on collateral review, *id.* at 6. Thus, the Court re-affirms its dismissal of this ground.

### 3.2.2    Improper Sentence Under 18 U.S.C. § 242

The Court dismissed Mr. Cates' eleventh ground, which argued that the maximum sentence Mr. Cates should have been subject to under 18 U.S.C. § 242 was one year in prison. But the jury specifically found that Mr. Cates was guilty of aggravated sexual abuse, which means that he was subject to "any term of years or…life" imprisonment. 18 U.S.C. § 242 ("if such acts include…aggravated sexual abuse…[the defendant] shall be fined under this title, or imprisoned for *any term of years or for life*, or both"). Thus, the Court re-affirms its dismissal of this ground.

### 3.2.3    Improper Duplicitous Indictment

The Court dismissed Mr. Cates' twelfth ground, which argued that he was subject to a duplicitous indictment. His argument in that regard was extremely unclear, so the Court understood him to mean that his indictment was multiplicitous and determined that it was not. (*See* Docket #4 at 9 (collecting cases in support)). In his motion for reconsideration, Mr. Cates argues that he did, indeed, mean that his indictment was duplicitous, but again he fails to offer any substance in support of his position. The Court instructed the jury that it had to reach a unanimous verdict as to the relevant questions on the verdict form and presented the jury with a verdict form that

asked several *separate* questions that would lead to different convictions. The jury answered each question in the verdict form, finding the defendant had deprived the victim of her civil rights and engaged in aggravated sexual abuse, but rejecting the Government's contention that bodily injury resulted or that Mr. Cates had used a firearm in connection with his offense. The fact that the jury was able to answer each of these parts separately establishes that the indictment and the verdict form were not duplicitous. Thus, the Court re-affirms its dismissal of this ground.

### 3.2.4    Failure to Provide Preliminary Hearing

The Court dismissed Mr. Cates' fifteenth ground, which argued that Mr. Cates should have received a preliminary hearing. As the Court has now discussed in both this order and its screening order, Mr. Cates was not entitled to a preliminary hearing because he was indicted. Fed. R. Crim. P. 5.1(a)(2). There is no basis to disagree. Thus, the Court re-affirms its dismissal of this ground.

### 3.2.5    Improper Exclusion of Minorities from Jury Pool

The Court dismissed Mr. Cates' sixteenth ground, which argued that Mr. Cates was prejudiced by a lack of minorities on the jury. Whether Mr. Cates was making a *Batson* challenge, specific to his jury, or was making a broader *Duren* challenge to the makeup of the venire in his case, the Court has already provided ample reason why his argument fails. He has not even come close to establishing a *prima facie* case as to either potential basis for relief. Without anything beyond Mr. Cates' speculation to support this ground, the Court will not entertain it. Thus, the Court re-affirms its dismissal of this ground

### 3.2.6 Fabrication of Evidence Grounds

The Court dismissed Mr. Cates' thirteenth, fourteenth, seventeenth, and nineteenth grounds, all of which alleged Government fabrication of evidence and presentation thereof. Even taking Mr. Cates' allegations as true, they raise nothing more than inconsistencies between witnesses; certainly, they do not come near knowing presentation of perjured testimony. In reality, these arguments are nothing more than unfounded speculation or meritless attacks on the sufficiency of the evidence. Nothing therein comes close to entitling Mr. Cates to an evidentiary hearing, let alone § 2255 relief. Thus, the Court re-affirms its dismissal of these grounds.

Mr. Cates' § 2255 motion is long on theory and short on substance. His nineteen separate grounds for relief are actually far more than that, as many of his grounds include multiple subparts. But none of them actually include allegations that would support a claim for ineffective assistance of counsel. The Seventh Circuit has implied that the cumulative effect of errors in representation may satisfy the *Strickland* standards. *See Yu Tian Li v. United States*, 648 F.3d 524, 533 (7th Cir. 2011). But, even looking for cumulative error, the Court can find none. Mr. Cates opted to go to trial in a difficult case and received a good defense. To be sure, his attorney later ran into serious trouble with the Seventh Circuit and Wisconsin's own bar regulators. But misconduct in other cases is not proof of ineffective assistance in *this* case. And, in the end, all appearances point to the conclusion that Ms. Boyle (together with Mr. Coffey) rendered effective assistance to Mr. Cates throughout the proceedings against him. Perhaps the parties' additional submissions relating to the single issue remaining (relating to Mr. Cates' grand jury ground) will alter the Court's analysis, and so the Court reserves

finally ruling until after it has received those materials. But, on the record at hand, the Court must dismiss nearly all of Mr. Cates' grounds for relief.

4.    CONCLUSION

In sum, the Court has rejected all but one of Mr. Cates' grounds for relief. It may deny Mr. Cates' motion for reconsideration, because it has (now for the second time) rejected every contention Mr. Cates raised therein. Nonetheless, with the grand jury-related ground still outstanding, the Court cannot yet deny Mr. Cates' § 2255 motion in full. In that regard, the Court will grant Mr. Cates' motions for production of grand jury materials (Docket #3; Case No. 11-CR-200, Docket #85) and order, pursuant to Fed. R. Cr. P. 6(e)(3)(E)(i), that the Government produce to Mr. Cates and to the Court copies of the materials previously provided to Ms. Boyle. After the Government has produced those materials, Mr. Cates will have 30 days to file a further brief addressing his grand jury-related contentions. The Government shall, thereafter, file a response within 30 days of receiving Mr. Cates' brief. Until the Court has received those briefs, it will hold Mr. Cates' § 2255 motion in abeyance. Only after addressing the grand jury issue will the Court finally address that motion and decide whether to grant or deny a certificate of appealability.

Accordingly,

IT IS ORDERED that Mr. Cates' motion for reconsideration (Docket #5) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that Mr. Cates' motions for production of grand jury materials (Docket #3; Case No. 11-CR-200, Docket #85) be and the same are hereby GRANTED pursuant to Fed. R. Cr. P. 6(e)(3)(E)(i); within fourteen (14) days of the entry of this order, the Government shall produce to Mr. Cates and to the Court copies of the grand jury materials that

were available to Ms. Boyle; within thirty (30) days of receiving those materials, Mr. Cates shall file a brief addressing his grand jury-related claim; and, within thirty (30) days of receiving Mr. Cates' brief, the Government shall file a response thereto; and,

IT IS FURTHER ORDERED that, pending resolution of the grand jury-related claim, Mr. Cates' § 2255 motion be and the same is hereby HELD in abeyance.

Dated at Milwaukee, Wisconsin, this 10th day of July, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge